# EXHIBIT A

**SUMMONS**

| | | |
|---|---|---|
| Attorney(s) | Vik Pawar | |
| Office Address | 6 South Street, Suite 201 | |

Town, State, Zip Code  Morristown, New Jersey 07960

Telephone Number  (212) 571-0805

Attorney(s) for Plaintiff  Vik Pawar

ADRIAN LOPEZ, Derivatively and on behalf of GLOBAL

DIGITAL SOLUTIONS, INC.

      Plaintiff(s)

      Vs.

William Delgado, Richard Sullivan, David Loppert, Jerome

Gomolski, Stephanie Sullivan, Arthur Noterman, et al.

      Defendant(s)

## Superior Court of New Jersey

| | |
|---|---|
| Mercer | COUNTY |
| Chancery | DIVISION |

Docket No:  C-70-16

## CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

    The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

    If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

    If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

                        *Michelle Smith*

                    Clerk of the Superior Court

DATED:  04/14/2017

Name of Defendant to Be Served:  Global Digital Solutions, Inc.

Address of Defendant to Be Served:  c/o InCorp Services, Inc., 208 West State Street, Trenton, NJ 08608

Revised 11/17/2014, CN 10792-English (Appendix XII-A)

**PAWAR LAW GROUP P.C.**
Vik Pawar, Esq.
20 Vesey Street, Suite 1210
New York, New York 10007
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vik@pawarlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown, Esq.
127A Cove Road
Oyster Bay Cove, New York 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*



FILED

SEP 1 9 2016

SUPERIOR COURT OF NJ
MERCER VICINAGE
CHANCERY

| | |
|---|---|
| ADRIAN LOPEZ, Derivatively and on behalf of GLOBAL DIGITAL SOLUTIONS, INC.<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM J. DELGADO, RICHARD J. SULLIVAN, DAVID A. LOPPERT, JEROME J. GOMOLSKI, STEPHANIE C. SULLIVAN, ARTHUR F. NOTERMAN, AND STEPHEN L. NORRIS,<br><br>Defendants,<br><br>and<br><br>GLOBAL DIGITAL SOLUTIONS, INC.,<br><br>Nominal Defendant. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION<br>MERCER COUNTY<br>GENERAL EQUITY PART<br><br>Docket No. _C-76-16_<br><br><br>**VERIFIED SHAREHOLDER<br>DERIVATIVE COMPLAINT**<br><br>**JURY DEMAND** |

- 1 -

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Adrian Lopez ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Global Digital Solutions, Inc. ("Global Digital" or the "Company"), files this Shareholder Derivative Complaint against Defendants William J. Delgado, Richard J. Sullivan, David A. Loppert, Jerome J. Gomolski, Stephanie C. Sullivan, Arthur F. Noterman, and Stephen L. Norris (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Global Digital, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Global Digital, news reports, securities analysts' reports and advisories about the Company, litigation documents involving the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoings committed by Global Digital's directors and officers starting at least as early as January 1, 2012 and continuing through the present.

2.      This is a classic fraud case whereby the Individual Defendants operated Global Digital as a shell to line their own pockets and those of their family members.  The manipulation of investors and misuse of Company assets is clear and straightforward.

3.      Moreover, between October 8, 2013 and August 12, 2016 (the "Relevant Period"), the investing public was under a false impression of the company's developmental advances, acquisition prospects, financial health, and the motives of management.  During the Relevant Period, the Individual Defendants breached their fiduciary duties in that they intentionally and/or recklessly (1) grossly mismanaged the Company and its assets so as to benefit themselves, including by causing the Company to pay themselves excessive compensation, and (2) made and/or caused the Company to make false and misleading statements and omissions of material fact regarding the Company's business, practices, operations, and prospects.

4.      These false and/or misleading statements and omissions of material fact caused an artificial inflation of Global Digital's stock price.

5.      The misleading statements and omissions pertained to the Company's business, operations, and prospects and were known to the Individual Defendants or recklessly disregarded by them.  The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced, rendering them personally liable to the Company for breaching their fiduciary duties.

6.      As a direct and proximate result of the Individual Defendants' gross mismanagement and false and misleading statements and omissions of material fact, the Company's stock has plummeted from nearly $1.00 to just over one tenth of a penny (i.e. $0.0014)!

7.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's former Chief Executive Officer ("CEO"), its current CEO/Chairman, its former Chief Financial Officer ("CFO"), and two of its former directors to a federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Fraud Class Action"), subjected the Company and certain of the Individual Defendants to a lawsuit brought by the SEC in the United States District Court for the Southern District of Florida, and also subjected the Company to the need to undertake internal investigations and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will cost the Company going forward many millions of dollars.

8.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

9.     In light of the (1) breaches of fiduciary duty engaged in by the Individual Defendants, one of whom comprises Global Digital's entire Board of Directors (the "Board"), (2) collective engagement in fraud by them, (3) substantial likelihood of their liability in this derivative action, (4) the standing of certain of them as Defendants in the Securities Fraud Class Action, and (5) lack of disinterested and/or independent directors, Global Digital's director, comprising the Company's entire Board, cannot consider a demand to commence litigation against himself or the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence needed under the law.

- 4 -

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over each Defendant named herein. Global Digital is incorporated in and registered to do business in New Jersey, and thus is at home in New Jersey. Each individual Defendant has sufficient minimum contacts with New Jersey so as to render the exercise of jurisdiction by the New Jersey courts permissible under traditional notions of fair play and substantial justice.

11.     This action is properly brought in the Chancery Division pursuant to New Jersey Court Rules, Part IV, Chapter 1, Rule ("*R.*") 4:3-1(a)(1) because the principal relief sought is equitable in nature.

12.     Venue is proper in this Court pursuant to *R.* 4:3-2(a)-(b) because Global Digital maintains a registered agent in this County. Global Digital's registered agent is Incorp Services Inc. located at 208 West State St., Trenton, NJ 08608. Moreover, Global Digital has a principal business address at 27 Madison St., Princeton, NJ 08542, also in this County. Thus, for purposes of *R.* 4:3-2(a)-(b), Global Digital resides in Mercer County, NJ.

## PARTIES

### Plaintiff

13.     Plaintiff is a current shareholder of Global Digital common stock. Plaintiff has continuously held Global Digital common stock at all relevant times.

### Nominal Defendant Global Digital

14.     Nominal Defendant Global Digital is a New Jersey corporation with its principal executive offices located at 777 South Flagler Drive, Suite 800 West Tower, West Palm Beach, Florida 33401.

15.     Global Digital's stock trades on the OTCQB Marketplace ("OTCQB") maintained by the OTC Markets Group under the symbol "GDSI."

**Defendant Delgado**

16.     Defendant William J. Delgado ("Delgado") has been the Company's CEO and Chairman since May 13, 2016. Between August 12, 2013 and May 13, 2016, Defendant Delgado served as Executive Vice President of the Company. Between 2004 and August 12, 2013, Defendant Delgado served as the Company's CEO, President, Chairman, and CFO. Defendant Delgado was a director of the Company at all relevant times. As of the date of the filing of this Complaint, Defendant Delgado is the only director on the Company's Board.

17.     According to Amendment No. 3 to Form 10, General Form for Registration of Securities, filed by the Company with the SEC on Form 10-12G/A on October 7, 2013 (the "2013 Registration"), as of July 29, 2013, Defendant Delgado beneficially owned 4,455,029 shares of the Company's common stock, which represented 5% of the Company's outstanding shares of common stock.

18.     According to the Company's Schedule 14C filed with the SEC on June 13, 2014 (the "2014 Proxy Statement"), as of May 19, 2014, Bronco Communications LLC, of which Defendant Delgado was a member, held 3,382,966 Company voting shares, which represented 3.33% of the Company's total voting shares. Moreover, according to the 2014 Proxy Statement, Tara S. Delgado and Brittney Delgado, both relatives of Defendant Delgado (one being Defendant Delgado's minor daughter) collectively owned 3,056,000 Company voting shares, which represented 2.99% of the Company's total voting shares. Thus, in total, as of May 19, 2014,

Defendant Delgado and affiliated individuals and entities owned over 6.3% of the Company's total voting shares.

19.   According to the Company's Schedule 14C filed with the SEC on April 21, 2015 (the "2015 Proxy Statement"), as of March 24, 2015, Defendant Delgado beneficially owned 7,307,555 shares of Company common stock, which represented 6.8% of the Company's outstanding shares and 6.8% of the Company's voting rights.

20.   Given that, as of the close of trading on October 8, 2013, one share of common stock traded for $0.85, Defendant Delgado beneficially owned at least $3.8 million worth of Company common stock during the Relevant Period.

21.   The following table summarizes the compensation received by Defendant Delgado:

| Fiscal Year | Total Compensation ($) | Salary ($) | Approximate Compensation Paid in Cash ($) | Approximate Compensation Paid in Stock ($) |
|---|---|---|---|---|
| 2012 | 199,990 | 199,990 | 199,990 | 0 |
| 2013[1] | 310,000 | 50,000 | 50,000 | 260,000 |
| 2014 | Not Reported | | | |
| 2015 | Not Reported | | | |

22.   The Company's annual report for the fiscal year ended December 31, 2014, filed with the SEC on March 30, 2015, (the "2014 10-K") stated the following about Defendant Delgado:

William J. Delgado (age 55) has served as our President, Chief Executive Officer and Chief Financial Officer from August 2004 to August 2013. Effective August 12, 2013, Mr. Delgado assumed the position of Executive Vice President, and is responsible, along with Mr. Sullivan, for business development. Mr. Delgado has over 33 years of management experience including strategic planning, feasibility studies, economic analysis, design engineering, network planning, construction and maintenance. He began his career with

---

[1] There are discrepancies in the reported executive compensation for the fiscal year ended December 31, 2013 between the Form 10-Ks filed by the Company with the SEC on March 28, 2014 and March 30, 2015, respectively. The figures from the latter filing were used herein.

Pacific Telephone in the Outside Plant Construction. He moved to the network engineering group and concluded his career at Pacific Bell as the Chief Budget Analyst for the Northern California region. Mr. Delgado founded All Star Telecom in late 1991, specializing in OSP construction and engineering and systems cabling. All Star Telecom was sold to International FiberCom in April of 1999. After leaving International FiberCom in 2002, Mr. Delgado became President/CEO of Pacific Comtel in San Diego, California. After the Company acquired Pacific Comtel in 2004, Mr. Delgado became Director, President, CEO and CFO of the Company. Management believes that Mr. Delgado's many years of business experience uniquely qualifies him for his positions with the Company.

**Defendant R. Sullivan**

23.      Defendant Richard J. Sullivan ("R. Sullivan") was the Company's CEO and Chairman from August 12, 2013 until his resignation on May 13, 2016.

24.      According to the 2013 Registration, as of July 29, 2013, Defendant R. Sullivan beneficially owned 25,460,000 shares of the Company's common stock, which represented 28.5% of outstanding common stock.

25.      According to the 2014 Proxy Statement, as of May 19, 2014, Defendant R. Sullivan himself owned 23,710,000 Company voting shares, which represented 23.35% of the total voting shares.  In addition, Bay Acquisition Corp., an entity controlled Defendant R. Sullivan, owned 3,000,000 voting shares, which represented 2.95% of the total voting shares.  Evan Sullivan and Defendant S. Sullivan, both relatives of Defendant R. Sullivan, collectively owned 1,030,000 voting shares, which represented 1.01% of the total voting shares.  Thus, in total, as of May 19, 2014, Defendant R. Sullivan and affiliated individuals and entities owned over 27.3% of the Company's total voting shares.

26.      According to the 2015 Proxy Statement, as of March 24, 2015, Defendant R. Sullivan beneficially owned 29,710,000 shares of Company common stock, which represented 27.6% of the Company's outstanding shares and 24.8% of the Company's voting rights.

- 8 -

27.     Given that, as of the close of trading on October 8, 2013, one share of common stock traded for $0.85, Defendant R. Sullivan beneficially owned at least *$21.6 million* worth of Company common stock during the Relevant Period.

28.     The following table summarizes the compensation received by Defendant R. Sullivan:

| Fiscal Year | Total Compensation ($) | Salary ($) | Approximate Compensation Paid in Cash ($) | Approximate Compensation Paid in Stock ($) |
|---|---|---|---|---|
| 2013 | 3,177,000 | 60,000 | 157,000 | 2.96 million |
| 2014 | 2,119,000 | 120,000 | 199,000 | 1.92 million |
| 2015 | Not Reported | | | |

29.     The 2014 10-K stated the following about Defendant R. Sullivan:

Richard J. Sullivan (age 76) was elected a director and appointed Chairman, CEO, President and assistant secretary on August 12, 2013. Prior thereto, from May 2012 through August 2013 Mr. Sullivan served as a consultant to the Company. Mr. Sullivan is responsible for the Company's strategy, leadership and day-to-day operational activities. Mr. Sullivan founded and since 1993 has served as Chairman and CEO of Solutions, Inc. and World Capital Markets, Inc., a both private investment banking companies that specialize in advising corporations on acquiring other business entities and assisting owners and management who are considering selling all or part of their business. Mr. Sullivan founded and from 1993 to 2003 served as Chairman and Chief Executive Officer of Applied Digital Solutions, Inc., a Nasdaq listed technology company that spawned two other listed companies of which he was Chairman of the Board: Digital Angel Corporation (AMEX) and VeriChip Corporation (Nasdaq). Mr. Sullivan is an "Entrepreneur in Residence" with Accretive Exit Partners, LLC whose business is taking positions in mid-stage private companies, replacing financing partners who wish to divest themselves of their equity share of those businesses. He is also co-founder of Vox Equity Partners, LLC, a specialized private equity fund manager that has been purchasing bank private equity portfolio investments since 2006. Management believes that Mr. Sullivan's many years as Chairman and CEO of public companies qualifies him for his positions with the Company.

**Defendant Loppert**

30.     Defendant David A. Loppert ("Loppert") was the Company's CFO from August 12, 2013 until his retirement on April 10, 2015.

- 9 -

31.     According to the 2013 Registration, as of July 29, 2013, Defendant Loppert beneficially owned 8,000,000 shares of the Company's common stock, which represented 9% of the Company's outstanding common stock.  According to the 2014 Proxy Statement, as of May 19, 2014, Defendant Loppert beneficially owned 8,000,000 Company voting shares, which represented 7.88% of the Company's total voting shares.  According to the 2015 Proxy Statement, as of March 24, 2015, Defendant Loppert beneficially owned 9,500,000 shares of the Company's common stock, which represented 8.8% of the Company's outstanding shares and 7.4% of the Company's voting rights.

32.     Given that, as of the close of trading on October 8, 2013, one share of common stock traded for $0.85, Defendant Loppert beneficially owned at least $6.8 million worth of Company common stock during the Relevant Period.

33.     The following table summarizes the compensation received by Defendant Loppert:

| Fiscal Year | Total Compensation ($) | Salary ($) | Approximate Compensation Paid in Cash ($) | Approximate Compensation Paid in Stock ($) |
|---|---|---|---|---|
| 2013 | 1,458,500 | 30,000 | 78,500 | 1.38 million |
| 2014 | 1,050,000 | 60,000 | 90,000 | 960,000 |
| 2015 | Not Reported | | | |

34.     The 2014 10-K stated the following about Defendant Loppert:

David A. Loppert (age 60) was appointed Executive Vice President, CFO, Treasurer and Secretary on August 12, 2013. From October 2012 through August 2013 Mr. Loppert served as a consultant to the Company. Mr. Loppert is responsible for the Company's finance and administrative functions. He is a financial executive with over 30 years experience. He previously served as chief financial officer, secretary and treasurer of rVue Holdings, Inc. (OTCQB: RVUE), from May 2010 until June 2012. Prior thereto he served as Argo Digital Solutions, Inc.'s senior vice president from March 2009 through January 2010, and from March 2010 through May 2010. He was formerly a director, executive vice president and chief financial officer of Surgical Outcome Support, Inc. from August

2006 through March 2009. From October 2003 through July 2006 he was an independent financial consultant to public and private companies. From June 2001 until September 2003, he was a vice president and director of QSGI Inc. (OTCBB: QSGI). From February 1997 through December 2000, he was vice president, chief financial officer and assistant secretary of Applied Digital Solutions, Inc. (NASDAQ: DIGA) and also served as chief executive officer of SysComm International Corporation, (NASDAQ: SYCM) a network and systems integrator, and an affiliate of Applied Digital.  Mr. Loppert began his financial career with Price Waterhouse, an international accounting firm, in 1978 in Johannesburg, South Africa, before moving to its Los Angeles Office in 1980 where over time he became a senior manager. Mr. Loppert earned bachelor's degrees in commerce in 1978 and in accounting in 1980, and a higher diploma in accounting in 1980, all from the University of the Witwatersrand, Johannesburg, South Africa, and was designated a Chartered Accountant (South Africa) in 1980.

### Defendant Gomolski

35.    Defendant Jerome J. Gomolski ("Gomolski") has been the Company's CFO since April 10, 2015, when he was appointed to replace Defendant Loppert.

36.    The 2015 Proxy Statement stated the following about Defendant Gomolski:

On April 10, 2015 David Loppert retired as our CFO and Jerome J. Gomolski, sixty seven years old, was appointed Chief Financial Officer. Mr. Gomolski has for the past 30 years specialized in auditing, corporate and individual income tax, and, forensic accounting. He began his financial career in the corporate accounting department of International Harvester in Chicago. After graduating from DePaul University in Chicago with a BSC in Accounting he passed the Illinois CPA exam and began working for several large accounting firms. Several years later, he returned to International Harvester as Manager of Financial Planning and Analysis. In 1982, Mr. Gomolski was offered an opportunity to relocate to South Florida and return to public accounting. There he brought his experience and talent to work with two large accounting firms. His increasing responsibility led to a partnership. He continues to maintain his own practice. Mr. Gomolski currently serves as the Chief Financial Officer for a Private Equity Fund and for North American Custom Specialty Vehicles, Inc., a subsidiary of the Company.

On April 1, 2015, the Company granted Mr. Gomolski an option to acquire 500,000 shares of its common stock at an exercise price of $.10 per share. The options vest 1/3 after six months, one third after 12 months and 1/3 after 18 months, and are exercisable for a period of 10 years from the grant date.

### Defendant S. Sullivan

37.    Defendant Stephanie C. Sullivan ("S. Sullivan") was a Company director from August 12, 2013 until her resignation effective May 13, 2016.  Defendant S. Sullivan is the daughter of Defendant R. Sullivan, and was appointed to Global Digital's Board when she was about 25 years old, only two years after graduating from the University of Miami.  Her work history as listed on her Facebook page includes "Customer Service/Logistics Coordinator" for "Shop Alexis," "Operations Manager" for "Shop Alexis," and, between August 2014 to the present, "Assistant Store Manager" at INTERMIX in Miami Beach, Florida.  Both Shop Alexis and INTERMIX are retail clothing companies, not related in any way to the area of cyber arms technology and complementary security and technology solutions.

38.    According to the 2014 Proxy Statement, as of May 19, 2014, Defendant S. Sullivan owned 500,000 Company voting shares, which represented 0.49% of the total voting shares. According to the 2015 Proxy Statement, as of March 24, 2015, Defendant S. Sullivan beneficially owned 1,000,000 shares of Company common stock, which represented 0.9% of the Company's outstanding shares and 0.5% of the Company's voting rights.

39.    For the fiscal year ended December 31, 2014, Defendant S. Sullivan *received $320,000 in compensation from the Company*, all of which was paid in stock.

40.    The 2014 10-K stated the following about Defendant S. Sullivan:

Stephanie C. Sullivan (age 26) was appointed to our Board on August 12, 2013. Ms. Sullivan is a business entrepreneur and has served, since May 2011, *as financial manager* at Alexis Miami, a privately held upscale women's fashion designer and manufacturer. Ms. Sullivan graduated from the University of Miami in May 2011 with a Bachelor of Arts in Business Administration. Management believes that Ms. Sullivan's marketing and financial background bring a new and young approach that the Board will benefit from.

41.     The Company's description of Defendant S. Sullivan's employment history is directly contradicted by Defendant S. Sullivan's own description of her employment history. Accordingly, S. Sullivan's biography in the 2014 10-K was false and misleading.

**Defendant Noterman**

42.     Defendant Arthur F. Noterman ("Noterman") was a Company director from August 12, 2013 until his resignation effective May 13, 2016.

43.     According to the 2015 Proxy Statement, as of March 24, 2015, Defendant Noterman beneficially owned 500,000 shares of the Company's common stock, which represented 0.5% of the Company's outstanding shares.

44.     For the fiscal year ended December 31, 2014, Defendant Noterman received $320,000 in compensation from the Company, all of which was paid in stock.

45.     The 2014 10-K stated the following about Defendant Noterman:

Arthur F. Noterman (age 73) was appointed to our Board on August 12, 2013. Mr. Noterman is a Chartered Life Underwriter. Mr. Noterman has owned an investment and insurance business for over 40 years located in Massachusetts and is a registered FINRA Broker affiliated with a Cincinnati, Ohio Broker/ Dealer. Mr. Noterman served on the Board of Directors of Applied Digital Solutions Inc. from 1997 to 2003, serving on the Audit and Compensation Committees. Mr. Noterman attended Northeastern University, Boston, MA from 1965-1975 and obtained the Chartered Life Underwriter Professional Designation in 1979 from The American College, Bryn Mawr, Pennsylvania. Management believes that Mr. Noterman's many years as a director of public companies, his financial background, and his many years serving on audit and compensation committees uniquely qualifies him for his position as a director of the Company.

**Defendant Norris**

46.     Defendant Stephen L. Norris ("Norris") was a Company director and Vice Chairman of the Company from July 2014 until his resignation on January 9, 2015. At the time

- 13 -

of his appointment he was the Chairman and CEO of Global Digital's wholly owned subsidiary, GDSI International.

47.    The Company paid Defendant Norris a monthly fee of $6,000 in cash, monthly in arrears commencing July 31, 2014 through November 30, 2014.  For the fiscal year ended December 31, 2014 (only five full months of service), Defendant Norris received a whopping $3,630,000 in compensation from the Company, $30,000 of which was paid in cash and $3.6 million of which was paid in stock.

48.    The 2014 10-K succinctly stated the following about Defendant Norris: "Stephen L. Norris (age 64) was elected a director and CEO of GDSI International on July 2, 2014 and appointed Vice Chairman on July 7, 2014. Mr. Norris resigned as a director and officer on January 9, 2015."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

49.    By reason of their positions as officers, directors and/or fiduciaries of Global Digital and because of their ability to control the business and corporate affairs of Global Digital, the Individual Defendants owed to Global Digital and its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company as well as in the use and preservation of its property and assets, and were and are required to use their utmost ability to control and manage Global Digital in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Global Digital and its shareholders so as to benefit all shareholders equally.

50.    Each director and officer of the Company owes to Global Digital and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Global Digital, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

52.    To discharge their duties, the officers and directors of Global Digital were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

53.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Global Digital, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Global Digital's Board at all relevant times.

54.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the OTCQB, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to, *inter alia*, the Company's financial condition, performance, growth, operations, financial statements,

business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company and its ability to acquire various companies, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those events described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

55.    To discharge their duties, the officers and directors of Global Digital were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Global Digital were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New Jersey, Florida, and the United States, and pursuant to Global Digital's own Code of Conduct and Ethics and internal guidelines;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Global Digital conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Global Digital and procedures for the reporting of the business and

internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Global Digital's operations would comply with all laws and Global Digital's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

56.     Each of the Individual Defendants further owed to Global Digital and the shareholders the duty of loyalty requiring that each favor Global Digital's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

57.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Global Digital and were at all times acting within the course and scope of such agency.

58.     Because of their advisory, executive, managerial, and directorial positions with Global Digital, each of the Individual Defendants had access to adverse, non-public information about the Company.

59.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Global Digital.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price to attract maximal assets from investors only to be wasted on undeserved compensation and perks for the executives of the Company and consultants.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to engage in the schemes described herein, including the concealment of material facts, failing to correct

- 18 -

misrepresentations, and violation of applicable laws. During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that the Company was a shell with no revenue, no legitimate prospects, and was being managed and operated for the sole benefit of Company insiders. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority and approval of the Board, each of the Individual Defendants who are or were directors of Global Digital was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Global Digital, and was at all times acting within the course and scope of such agency.

## CODE OF ETHICS

65.     Pursuant to the Company's Code of Conduct and Corporate Ethics General Policy Statement (the "Code of Ethics"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

- 19 -

66.    According to the Code of Ethics, all recipients were required to read and retain a copy of the Code of Ethics.

67.    The Code of Ethics provides, as to "Conflicts of Interest," that:

Every Employee shall avoid any act or circumstance that could cast doubt on his or her ability to act with total objectivity in regard to the Company's interest. Employees shall conduct the Company's affairs on an arm's-length basis and not engage in business or financial activity that may conflict with that of the Company. Towards this end, Employees must not place themselves or the Company in a position that would create even the appearance of a conflict of interest. No Employee may represent the Company in any transaction if an outside business interest or personal relationship might compromise or otherwise affect his or her ability to represent the Company's interests fairly and impartially.

68.    The Code of Ethics provides, as to "Transactions with Affiliates," that:

If Employees or Relatives are affiliated with, plan to be affiliated with or will have a financial interest of more than 5% in any of the entities listed immediately below, they must disclose the affiliation to senior management by submitting a Receipt and Disclosure Certificate to the Human Resources Department:

- Business enterprises that compete with the Company.

- Business enterprises that are customers of the Company.

- Suppliers of goods or services to the Company.

- Business enterprises that do business with the Company.

The Board of Directors shall determine whether such interest or affiliation represents a conflict of interest and whether such interest or affiliation should be disposed of, discontinued or limited. For purposes of this Code, a Relative is defined as the Employee's spouse, domestic partner, mother, father, brother, sister, child, mother/father-in-law, sister/brother-in-law, grandparent, grandchild or another individual living in the Employee's residence.

69.    The Code of Ethics provides, as to "Employment of Relatives," that:

If any Employee has a Relative that is employed in any capacity by the Company, its divisions, parent, subsidiaries or affiliates, this must be disclosed by submitting a Receipt and Disclosure Certificate to the Human Resources Manager at the time the Employee

- 20 -

accepts such employment and each year to the Human Resources Department when this Code is distributed for signature.

70.     The Code of Ethics provides, as to "Use of Corporate Assets and Intellectual

Property," that:

> The assets (including computer equipment, software and telephones) of the Company should be used prudently and primarily for company business purposes. Company assets should not be used for the personal benefit of individual Employees, except as specified in official compensation and benefit programs.

> Protection of Company Assets. Proper use of the Company's property, facilities, equipment and other assets is an Employee's responsibility. Employees should use and maintain these assets with the utmost care and respect, guarding against waste and abuse, and being cost-conscious and alert to opportunities for improving performance while reducing costs. The use of Company time, material, or facilities for purposes not directly related to Company business, or the removal or borrowing of Company property without appropriate permission, is prohibited.

> This obligation to protect, and properly use, the Company's assets includes the Company's customer relationships and intellectual property, such as information about products, services, customers, systems and people. These assets also include the Company's trademarks, patents, copyrights, trade secrets, business and marketing plans, records, compensation information, and any other proprietary information belonging to the Company. All property created, obtained or compiled by or on behalf of the Company, including customer lists, directories, files, reference materials and reports, computer software, data processing systems, computer programs and databases, belong to the Company.

> Any invention, discovery, development, concept, idea, process or work related to the Company's business, written or otherwise, whether or not it can be patented or copyrighted, that an Employee develops alone or with others during employment with the Company or any of its subsidiaries (all of which are referred to as "Company Inventions") belongs to the Company. If a Company Invention is something that can be copyrighted and an Employee creates it as a part of his/her job with the Company or any of its subsidiaries, or because the Company or a subsidiary asked the employee to create it, it is a "work made for hire." The Company is not required to acknowledge an Employee's role in the creation of any Company Inventions and does not need Employee permission to modify, expand, or benefit from it.

> As a condition of employment with the company, you assign exclusively to the Company all right, title and interest in any future Company Inventions. You further agree to assist the Company in obtaining for its own benefit intellectual property rights, including any

- 21 -

patents and copyrights, in the Company Inventions—and agree to deliver any documents that may be requested to assure, record or perfect your assignment of the Company Inventions to the Company.

71.    The Code of Ethics provides, as to "Accounting Systems, Books and Records," that:

No Employee shall make any knowingly false entries on any record of the Company. No Employee shall knowingly violate any internal control policy or procedure. No Employee shall solicit, accept, prepare or utilize any affidavit, declaration or report that he/she knows or suspects to be materially false or misleading. Books and records will be maintained in accordance with generally accepted accounting principles. All receipts, payments, transfers and other transactions must be timely reflected in full detail in the appropriate business and accounting records of the Company. All entries to the Company's books shall reflect the true intention of the transaction. Any Employee who knows of any unrecorded or erroneously recorded asset or property, any false entry, or any unlawful or improper act must report it promptly to the Board of Directors of the Company. No Employee shall accept compensation from the Company unless the Company has properly authorized that compensation.

72.    The Code of Ethics provides, as to "Reporting Procedures," that:

Each employee has an affirmative obligation to read this Code carefully, seek clarification of any portion of it that he or she does not understand, and to report in writing any known or suspected violation of the Code by themselves, their families or any person under his or her supervision or control. No retribution will be taken against a person for reporting in good faith a violation or a suspected violation.

Employees who violate this Code will be subject to appropriate disciplinary action, which may include termination of employment.

73.    The Code of Ethics also explains that the "Company is committed to compliance with applicable U.S. and foreign laws and regulations that apply to its operations."

74.    In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting and the Individual Defendants' schemes to (1) grossly mismanage the Company and its assets so as to benefit themselves and (2) issue materially false and misleading

- 22 -

statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.  In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to (1) keep and maintain accurate business records, (2) protect corporate assets, (3) avoid conflicts of interest, (4) report violations of the Code of Ethics, and (5) comply with all applicable laws, including those related to making accurate and truthful SEC filings.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background on Global Digital

75.     Global Digital was incorporated in New Jersey as Creative Beauty Supply, Inc. ("Creative") in August 1995.

76.     In March 2004, Creative acquired Global Digital Solutions, Inc. ("Global I"), a Delaware corporation.  The merger was treated as a recapitalization of Global I, and Creative changed its name to Global Digital Solutions, Inc. (i.e., Global Digital).

77.     Global Digital represented to the public that on May 1, 2012, it made the decision to wind down its operations in the telecommunications area (completed in June 2014) while concurrently refocusing its efforts *in the area of cyber arms technology and complementary security and technology solutions*.

78.     Despite its representations, the Company has not been operated properly.

79.     The Company sustained losses and experienced negative cash flows from operations since inception.  For example, for the year ended December 31, 2014 the Company incurred a net loss of $11,657,188, and used net cash of $708,040 to fund operating activities, and net cash of $239,697 for financing activities.  As of December 31, 2014, the Company had an

- 23 -

accumulated deficit of $28,515,563, cash and cash equivalents of $160,102, working capital of $192,628, and stockholders' equity of $152,406.

80.     Moreover, the Company has expressed substantial doubt about its ability to continue as a going concern.

81.     Beyond its putrid financial condition, Global Digital has often had and continues to have issues with timely filing its reports due to be filed with the SEC.

82.     Furthermore, the Company has never updated its registered Standard Industrial Classification ("SIC") code with the SEC and is still listed under SIC: 2844 – Perfumes, Cosmetics & Other Toilet Preparations.

83.     This is all because the Company is not truly managed as a for-profit Company operated for its shareholders but rather was, at least during the Relevant Period, operated as a shell Company that manufactured stories to artificially inflate its stock and defraud investors while Company insiders, their friends, and their family members received grossly excessive compensation, attempted to conceal stock holdings, and used affiliates to control the Company.

84.     Indeed, during the Relevant Period, the Company was fully controlled by insiders. For example, the 2014 Proxy Statement disclosed that, as of May 19, 2014, 52.1% of the Company's voting shares were held by Company insiders (i.e. individuals employed by, in contract with, or related to an employee or consultant of the Company).  The 2015 Proxy Statement revealed that, as of March 24, 2015, 56.27% of the Company's voting shares were held by Company insiders.  The relevant tables detailing the Company's controllers are below:

2014 Proxy Statement:

| Name | Affiliation With Company | Number of Voting | % of Total |
|------|--------------------------|------------------|------------|

| Name | Affiliation With Company | Shares | Voting Shares |
|---|---|---|---|
| Richard J Sullivan | Chairman and CEO of the Company | 23,710,000 | 23.35% |
| David A. Loppert | Chief Financial Officer of the Company | 8,000,000 | 7.88% |
| Cross Pacific Partners, LLC | Edwin J. Wang, the managing member is a member of the Company's Advisory Board | 4,000,000 | 3.94% |
| Bronco Communications LLC | William J. Delgado, an Executive Vice President of the Company is a member of this entity | 3,382,966 | 3.33% |
| Bay Acquisition Corp. | An entity controlled by Richard J. Sullivan, our Chairman & CEO | 3,000,000 | 2.95% |
| Western Financial | Affiliated with William J. Delgado | 2,200,000 | 2.17% |
| Tara S. Delgado | Related to William J. Delgado | 1,536,000 | 1.51% |
| Brittney Delgado | Related to William J. Delgado | 1,500,000 | 1.48% |
| Jennifer S. Carroll | Member of the Company's Advisory Board | 1,250,000 | 1.23% |
| Vox Equity Holdings, LLC | Matthew Kelley, the managing member is a member of the Company's Advisory Board | 1,250,000 | 1.23% |
| K. Brett Thackston | None | 1,250,000 | 1.23% |
| Gary A. Gray | Vice President of the Company | 1,000,000 | 0.98% |
| Evan Sullivan | Related to Richard J. Sullivan | 530,000 | 0.52% |
| Stephanie Sullivan | Director of the Company | 500,000 | 0.49% |
| TOTAL | | 53,108,966 | 52.31% |

2015 Proxy Statement:

| Name | Affiliation With Company | Number of Voting Shares | % of Total Voting Shares |
|---|---|---|---|
| Richard J Sullivan | Chairman and CEO of the Company | 23,710,000 | 22.03% |
| David A. Loppert | Former Chief Financial Officer of the Company* | 8,000,000 | 7.43% |
| Cross Pacific Partners, LLC | Edwin J. Wang, the managing member, is Chairman of the Company's Advisory Board | 4,000,000 | 3.72% |
| Three Rivers Investments, LLC | William J. Delgado, an Executive Vice President of the Company, is a member of this entity | 3,985,523 | 3.70% |
| Bronco Communications LLC | William J. Delgado, an Executive Vice President of the Company, is a member of this entity | 3,221,032 | 2.99% |
| Bay Acquisition Corp. | Controlled by Richard J. Sullivan, our Chairman & CEO | 3,000,000 | 2.79% |
| Western Financial | Affiliated with William J. Delgado | 2,200,000 | 2.04% |
| Tara S. Delgado | Related to William J. Delgado | 1,536,000 | 1.43% |
| Brittney Delgado | Related to William J. Delgado | 1,500,000 | 1.39% |
| Gary A. Gray | Vice President of the Company | 1,500,000 | 1.39% |
| K. Brett Thackston | Consultant to the Company | 1,500,000 | 1.39% |
| Jennifer S. Carroll | Former president of North American Custom Specialty Vehicles, Inc., a subsidiary of the Company, and a former member of the Company's Advisory Board | 1,250,000 | 1.16% |
| Vox Equity Holdings, LLC | Matthew Kelley, the managing member, is a member of the Company's Advisory Board | 1,250,000 | 1.16% |
| E. Eldredge Floyd | None | 1,046,000 | 0.97% |

| Contstantino Galaxidas | None | 821,429 | 0.76% |
|---|---|---|---|
| Evan Sullivan | Related to Richard J. Sullivan | 530,000 | 0.49% |
| Marlene Faye Gray | Former wife of an officer of the Company | 500,000 | 0.46% |
| Stephanie Sullivan | Director of the Company, Related to Richard J. Sullivan | 500,000 | 0.46% |
| Ross L. Trevino | Vice President of the Company | 500,000 | 0.46% |
| TOTAL | | 60,549,984 | 56.27% |

85.     Relatives of Company executives were not just used as surrogates to shelter Company shares but in some cases were given lucrative Board positions, with substantial control of Company affairs, even though they were wholly unqualified to hold such positions.  One such example is Defendant S. Sullivan, who was Defendant R. Sullivan's 25 year old daughter who had just gotten her degree from the University of Miami when she was given a Board position paying $320,000 annually!  At the time of her appointment to the Board, S. Sullivan had no experience outside of working for retail clothing stores, and thus had no experience working in the area of cyber arms technology and complementary security and technology solutions.[2]

86.     To make matters worse, shareholders could not object to the appointment of Defendant S. Sullivan because the Board had sole discretion in appointing Board members. Indeed, the 2015 10-K explained that "[a] vacancy on our board of directors may be filled by the vote of a majority of the directors holding office."

87.     Moreover, going as far back as 2012, Global Digital dealt extensively with entities owned or controlled by Company insiders.  For example, on January 1, 2012, the Company acquired a 51% stake in Bronco Communications, LLC, ("Bronco") a Nevada-California regional telecommunications subcontractor located in Folsom, CA in consideration for 4,289,029 shares of

---

[2] The Company made misleading statements of material fact in describing Defendant S. Sullivan's experience in the 2014 10-K, but even if everything in Defendant S. Sullivan's biography were true and accurate she would still be woefully unqualified for a position on the Board.

the Company's restricted common stock valued at $0.035 per share, or $150,116. Defendant Delgado owns a 10% membership interest in Bronco. On October 15, 2012, the Company entered into an Amendment to Purchase Agreement, whereby the Company agreed to relinquish control of Bronco to its minority shareholders, i.e. Defendant Delgado, effective as of January 1, 2013. Moreover, the Company, in the 2014 10-K, disclosed the following self-interested transactions between the Company and Company insiders:

> On December 8, 2014, we entered into a Securities Purchase Agreement ("Charter SPA") with Charter 804CS Solutions, Inc. ("Charter"), an affiliate of Richard J. Sullivan, our Chairman and CEO, providing for the purchase of a Convertible Promissory Note in the principal amount of $37,500 ("Charter Note"). The Charter Note: contains a $1,500 original issue discount to cover legal fees such that the cash proceeds received on the closing of Charter Note is $36,000; bears interest at the rate of 8% per annum; is due and payable on December 8, 2015; and by amendment (the "Charter Amendment") may be converted by Charter at any time after 180 days of the date of closing into shares of Company common stock at a fixed conversion price of $0.09 per share of Common Stock. The Charter Note also contains certain representations, warranties, covenants and events of default, and increases in the amount of the principal and interest rates under the note in the event of such defaults.

> On December 8, 2014, we entered into a Securities Purchase Agreement ("Loppert SPA") with David A. Loppert ("Loppert"), our Chief Financial Officer, providing for the purchase of a Convertible Promissory Note in the principal amount of $31,500 ("Loppert Note"). The Loppert Note: contains a $1,500 original issue discount to cover legal fees such that the cash proceeds received on the closing of the Loppert Note is $30,000; bears interest at the rate of 8% per annum; is due and payable on December 8, 2015; and may be converted by Loppert at any time after 180 days of the date of closing into shares of Company common stock at a conversion price of $0.09 per share of Common Stock. The Loppert also contains certain representations, warranties, covenants and events of default, and increases in the amount of the principal and interest rates under the note in the event of such defaults.

## Background on Defendants R. Sullivan and Loppert – Fraudsters Extraordinaire

88.     Both Defendants R. Sullivan and Loppert have a history spanning over at least 12 years of being sued by former investors in corporations they controlled. These lawsuits against R. Sullivan and Loppert involved alleged violations of the Securities Exchange Act, fraud and related

- 27 -

misconduct.  In fact, R. Sullivan was a named defendant in at least fifteen lawsuits for allegedly committing securities fraud on investors and/or violating various provisions of the Securities Exchange Act.

## Oct. 2012-Nov. 2013: Merger Debacle and Misrepresentations Related to Airtronic

89.     Airtronic USA, Inc. ("Airtronic") was founded in 1993 and is a manufacturer of small arms pursuant to its SIC Code.  Airtronic assembles weapons in accordance with classified plans and specifications approved by the United States government and distributes these weapons from components manufactured by Airtronic subcontractors to the United States Military, the defense ministries for certain approved foreign allies, and occasionally to private federal-agency customers.  Airtronic's approved weapons include grenade launchers, rocket launchers, assault rifles, and machine guns.

90.     On or about March 13, 2012, five unsecured creditors forced Airtronic into an involuntary Bankruptcy Petition under Chapter 7, Case #12-09776, U.S. Bankruptcy Court, Northern District of Illinois ("Bankruptcy Case").

91.     On or about May 17, 2012, the Bankruptcy Case was converted to a Chapter 11 case by the Bankruptcy Court.

92.     In or about July 2012, Airtronic and its CEO were introduced to Defendant R. Sullivan and Defendant Loppert, who represented themselves to be principals of Global Digital. At that time, and throughout the Airtronic-Global Digital relationship, Global Digital was a "shell corporation" with no operations and no revenue.  Its shares of common stock were traded over the counter on pink sheets.  At the time of the aforementioned introduction, Global Digital had

175,000,000 authorized shares of common stock, of which less than 50,000,000 shares had been issued and were outstanding.  In July 2012, Global Digital's stock was trading at $0.01 per share.

93.     Indeed, Global Digital did not have any fixed offices until August 2013, when it rented facilities where it could have conference meetings from time to time.

94.     Despite these shortcomings, on or about October 22, 2012 Global Digital and Airtronic entered into a Merger Agreement ("Merger Agreement") based on Global Digital's assurances to Airtronic, including a promise by Global Digital to provide three secured loans to Airtronic for the continuation of its business.

95.     Under the Merger Agreement, Global Digital agreed to acquire 70% of Airtronic in exchange for cash, common stock and other consideration.  The parties agreed the Merger Agreement would close within sixty days of the confirmation of Airtronic's Plan of Reorganization pending in the Bankruptcy Case.[3]

96.     From October 2012 through November 2013, the Company was actively involved in the day to day management of Airtronic pending the completion of the Merger.  Indeed, Global Digital was assisting Airtronic in putting together its Plan of Reorganization.

97.     On or about August 21, 2013, Airtronic filed an Amended Plan of Reorganization and Disclosure Statement with the Bankruptcy Court.

98.     On October 2, 2013, following a hearing on the amended plan, the Bankruptcy Court confirmed the Airtronic Amended Plan of Reorganization (the "Plan").

---

[3] Some of the allegations herein are based on allegations and Company admissions set forth in the Amended Complaint (D.I. 47) filed on May 30, 2014 and the Answer to Amended Complaint and Counterclaims (D.I. 68) filed on October 27, 2014 in *Global Digital Solutions, Inc. v. Merriellyn Kett Murphy*, 14-cv-80190-DTKH (S.D. Fla. originally filed January 9, 2014).

99.     Under the terms of the Plan, Airtronic needed to close the Merger with the Company within 60 days following the confirmation date, i.e., on or before December 2, 2013, to obtain the funds necessary to pay its creditors in accordance with the Plan. Thus, the deadline for closing the merger was December 2, 2013.

100.     Closing of the Merger was unlikely as the Company was in breach of several loan obligations to Airtronic.

101.     Nonetheless, on October 8, 2013, the Company issued a press release titled, "Global Digital Solutions' Planned Merger Partner, Airtronic USA, Becomes Exclusive OEM Supplier For A Major International Client Under A Private Label Agreement With An Estimated First Stage Value of Approximately $95 Million," and containing the heading, "The agreement is for Airtronic's family of M203 and M203A grenade launchers, some of which will be equipped with Airtronic's patent-pending locking device that imparts enhanced stability and accuracy" (the "10/8/13 Press Release").[4]

102.     The 10/8/13 Press Release provided as follows:

PALM BEACH, Fla., Oct. 8, 2013 /PRNewswire/ -- Global Digital Solutions, Inc. (GDSI), a company that is positioning itself as a leader in providing small arms manufacturing, complementary security and technology solutions and knowledge-based, cyber-related, culturally attuned social consulting in unsettled areas, today announced that the company's planned merger partner, Airtronic USA, Inc. ("Airtronic"), has become the exclusive OEM (Original Equipment Manufacturer) supplier for a major international client under a private label agreement with a first stage value of approximately $95 million.

The agreement is for Airtronic's family of M203 and M203A grenade launchers, some of which will be equipped with Airtronic's patent-pending locking device that imparts enhanced stability and accuracy.

---

[4] *See* http://www.prnewswire.com/news-releases/global-digital-solutions-planned-merger-partner-airtronic-usa-becomes-exclusive-oem-supplier-for-a-major-international-client-under-a-private-label-agreement-with-an-estimated-first-stage-value-of-approximately-95-million-226887101.html (last accessed September 8, 2016).

"This is exciting but not completely unexpected news," said GDSI's President and CEO Richard J. Sullivan. "The agreement demonstrates what we have been saying all along: Airtronic is well-positioned for strong growth as a well-respected, advanced small arms manufacturer. We congratulate the entire Airtronic team on this significant development."

On October 2, 2013, the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, confirmed the amended chapter 11 bankruptcy reorganization plan ("Plan") submitted by Airtronic. Now that the Plan has been confirmed by the court, GDSI will be able to complete its acquisition of Airtronic. Airtronic's bankruptcy case will be dismissed upon the consummation of the Plan – which includes completion of the merger with GDSI – and Airtronic will be capitalized with adequate working capital to compete effectively as an innovative leader in small arms manufacturing.

"We're thrilled to be able to announce this substantial OEM agreement so soon after the court confirmed our reorganization plan," said Dr. Merriellyn Kett, Airtronic's President and CEO who will continue serving as the company's CEO after the merger between GDSI and Airtronic is finalized. "The Airtronic team has been very busy working to meet the needs of our customers in the United States and around the world. This exclusive OEM agreement is a testament to the world-class quality of our products and the excellent relationships we have established with our customers over the years."

Founded in 1990, Airtronic is a well-respected, award-winning manufacturer of critical battlefield weapons. The company provides small arms and small arms spare parts to the U.S. Department of Defense, foreign militaries, and the law enforcement market. The company's products include grenade launchers, rocket propelled grenade launchers, grenade launcher guns, flex machine guns, grenade machine guns, rifles, and magazines.

Airtronic is a member of the National Small Arms Technology Consortium (NSATC) and the largest woman-owned small arms manufacturing company in the United States. The company has received commendations from the US Army Tank, Armaments, and Automotive Command and the Defense Logistics Agency for the quality and on-time delivery of its products.

**About Global Digital Solutions, Inc.**

Global Digital Solutions is positioning itself as a leader in providing small arms manufacturing, complementary security and technology solutions and knowledge-based, cyber-related, culturally attuned social consulting in unsettled areas. For more information please visit http://www.gdsi.co.

**About Airtronic USA, Inc.**

Airtronic is an electro-mechanical engineering design and manufacturing company. It provides small arms and small arms spare parts to the U.S. Department of Defense, foreign militaries, and the law enforcement market. . The company's products include grenade

launchers, rocket propelled grenade launchers, grenade launcher guns, flex machine guns, grenade machine guns, rifles, and magazines. Founded in 1990, the company is based in Elk Grove Village, Illinois. On May 16, 2012, the Chapter 7 bankruptcy of Airtronic was converted to a Chapter 11 reorganization. The company's Chapter 7 bankruptcy case had begun on March 13, 2012. For more information, please visit www.Airtronic.net.

103.    The 10/8/13 Press Release was not approved by Airtronic prior to release.

104.    The Company issued another press release just a few days later, on October 11, 2013, titled "Global Digital Solutions, Inc. (GDSI) Receives Notification That the Securities and Exchange Commission (SEC) Has Completed Its Review of the Company's Form 10 Registration Statement -- GDSI Is Now a Reporting Company Under the Securities Exchange Act of 1934," and containing the headline, "Continuing GDSI's recent momentum, this announcement comes soon after GDSI's planned merger partner, Airtronic USA, Inc., signed OEM supplier agreement with a first stage value of approximately $95 million" (the "10/11/13 Press Release").[5]

105.    The 10/11/13 stated the following, in relevant part:

PALM BEACH, Fla., Oct. 11, 2013 /PRNewswire/ -- Global Digital Solutions, Inc. (GDSI), a company that is positioning itself as a leader in providing small arms manufacturing, complementary security and technology solutions and knowledge-based, cyber-related, culturally attuned social consulting in unsettled areas, today announced that the Securities and Exchange Commission (SEC) has advised the Company that the SEC has completed its review of the Company's Registration Statement on Form 10, filed on August 10, 2013, as amended.

The Company is now a reporting Company under the Securities Exchange Act of 1934 and expects to file its quarterly report for the quarter ended September 30, 2013 on Form 10-Q within the prescribed time frame.

"This is another important step in the evolution of GDSI," said GDSI's President and CEO Richard J. Sullivan. "This news is especially welcome coming so soon after two other important developments: our October 8, 2013 announcement that Airtronic has become the exclusive OEM supplier for a major international client with a first stage value of approximately $95 million and the October 2nd court confirmation of Airtronic's

---

[5] See http://www.prnewswire.com/news-releases/global-digital-solutions-inc-gdsi-receives-notification-that-the-securities-and-exchange-commission-sec-has-completed-its-review-of-the-companys-form-10-registration-statement----gdsi-is-now-a-reporting-company-under-the-s-227370501.html (last accessed September 8, 2016).

reorganization plan.  All of these recent developments build enormous momentum for GDSI."

106.    The 10/11/13 Press Release contained the same "About" sections as the 10/8/13 Press Release.

107.    Ten days later, the Company issued yet another press release touting the impending merger with Airtronic, titled "Global Digital Solutions, Inc. (GDSI) Continues Recent Momentum By Signing Midtown Partners & Company LLC, Headquartered In New York City, As Exclusive Investment Banking Advisor," and containing the headline, "Midtown Partners specializes in providing creative financial solutions to high growth companies within the lower middle market across a broad range of industries relevant to GDSI's global growth strategy, including defense, technology, energy and alternative energy, natural resources and aerospace, and emerging markets" (the "10/21/13 Press Release").[6]

108.    The 10/21/13 Press Release stated the following, in relevant part:

PALM BEACH, Fla., Oct. 21, 2013 /PRNewswire/ -- Global Digital Solutions, Inc. (GDSI), a company that is positioning itself as a leader in providing small arms manufacturing, complementary security and technology solutions and knowledge-based, cyber-related, culturally attuned social consulting in unsettled areas, today announced that it has signed Midtown Partners & Company, LLC ("Midtown") of New York City as its exclusive investment banking advisor.

"This agreement with Midtown Partners continues GDSI's recent momentum," said GDSI's President and CEO Richard J. Sullivan. "As announced on October 11, 2013, we are now a reporting Company under the Securities Exchange Act of 1934. *Before that we announced on October 8, 2013, that our planned merger partner Airtronic USA has become the exclusive OEM supplier for a major international client with a first stage value of approximately $95 million.  Also, on October 2nd, we announced court confirmation of Airtronic's reorganization plan.*[7]  Today's announcement means that

---

[6] *See* https://www.thestreet.com/story/12075432/1/global-digital-solutions-inc-gdsi-continues-recent-momentum-by-signing-midtown-partners-company-llc-headquartered-in-new-york-city-as-exclusive-investment-banking-advisor.html (last accessed September 8, 2016).

[7] Unless otherwise noted, throughout this Complaint, emphasis in bold and italics is added and emphasis that is only in bold appears as in original.

- 33 -

we're partnering with a proven and experienced team of investment advisors who have a track record of success in securing financing in industries and sectors that are relevant to our global growth strategy. We're excited about this agreement and we expect to see very good things to emerge as we move forward in executing our global growth strategy."

About Global Midtown Partners & Co., LLC Midtown Partners is a leading independent investment bank focused on facilitating growth by providing creative and unique financial solutions to high growth companies within the lower middle market. The Midtown Partners team of senior professionals has experience across a broad range of industries and sectors including defense, healthcare, technology, energy and alternative energy, natural resources, aerospace, consumer/retail and emerging markets. With over 100 years of collective experience, Midtown Partners' senior professionals have raised in excess of $4 billion in both the public and private debt and equity markets. They are one of the leading Private Investment in Public Equity ("PIPE") Placement Agents, often ranking among the top five leading investment banks by number of closed PIPE transactions. For more information about Midtown Partners, visit www.midtownpartners.com.

About Global Digital Solutions, Inc. Global Digital Solutions is positioning itself as a leader in providing small arms manufacturing, complementary security and technology solutions and knowledge-based, cyber-related, culturally attuned social consulting in unsettled areas. For more information please visit http://www.gdsi.co .

About Airtronic USA, Inc. Airtronic is an electro-mechanical engineering design and manufacturing company. It provides small arms and small arms spare parts to the U.S. Department of Defense, foreign militaries, and the law enforcement market. The company's products include grenade launchers, rocket propelled grenade launchers, grenade launcher guns, flex machine guns, grenade machine guns, rifles, and magazines. Founded in 1990, the company is based in Elk Grove Village, Illinois. On May 16, 2012, the Chapter 7 bankruptcy of Airtronic was converted to a Chapter 11 reorganization. The company's Chapter 7 bankruptcy case had begun on March 13, 2012.  For more information, please visit www.Airtronic.net.

109.    The 10/21/13 Press Release was not approved by Airtronic prior to release.

110.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact in the 10/8/13 Press Release, 10/11/13 Press Release, and the 10/21/13 Press Release. Specifically, Defendants made false and/or misleading statements and/or failed to disclose, at least, that: (1) Airtronic did *not* become the exclusive OEM (Original Equipment Manufacturer) supplier for a major international

- 34 -

client under a private label agreement with a first stage value of approximately $95 million (indeed, no such agreement existed); (2) Airtronic only had an order for grenade launchers and accompanying equipment worth approximately $300,000; (3) the 10/8/13 Press Release and 10/21/13 Press Release were not approved by Airtronic; (4) Airtronic's CEO, Dr. Merriellyn Kett ("Kett"), did not make some of the statements attributed to her in the 10/8/13 Press Release and 10/21/13 Press Release; (5) Kett repeatedly requested Global Digital to remove these misleading statements from Global Digital's website and specifically cited its failure to do so as one of the reasons why Airtronic terminated the Merger Agreement, and (6) Global Digital was not positioning itself as a leader in providing small arms manufacturing, complementary security and technology solutions and knowledge-based, cyber-related, but instead was merely a shell company operating for the benefit of Company insiders, with no revenue stream, and no legitimate route to finance the deals it was touting.

111.    On November 11, 2013, only a few weeks after the false and misleading 10/21/13 Press Release, Global Digital raised $50,000 from investors through a private placement offering.

112.    Due in part to the Company's failure to correct its false and misleading statements about Airtronic from the Company's website despite repeated requests from the CEO of Airtronic as alleged above, the merger with Airtronic did not occur.

113.    On December 2, 2013, the merger broke down.

114.    As a result, shares of the Company fell $0.04 per share or 10% to close at $0.36 per share on December 3, 2013.

## November 2013 – False and Misleading Annual Revenue Projection

- 35 -

115.   On November 15, 2013, the Company issued a press release titled, "Global Digital Solutions, Inc., Offering Additional Details to the Public About Strategic Plans and Expected Near-Term Results, Anticipates Several Targeted Acquisition Agreements in the Fourth Quarter of 2013 and an Annual Revenue Run Rate Between $60 Million and $75 Million During the First Quarter of 2014," and containing the headline, "Today's announcement continues company's ongoing effort to keep the public apprised of important developments in implementing global growth strategy as outlined in the President and CEO's Open Letter released on October 29, 2013" (the 11/15/13 Press Release").[8]

116.   The 11/15/13 Press Release stated the following, in relevant part:

PALM BEACH, Fla., Nov. 15, 2013 /PRNewswire/ -- Global Digital Solutions, Inc. (GDSI), a company that is positioning itself as a leader in providing cyber arms manufacturing, complementary security and technology solutions and knowledge-based, cyber-related, culturally attuned social consulting in unsettled areas, today offered additional details about the company's strategic plans and expected near-term results.

During the fourth quarter of 2013, GDSI expects to be able to announce several agreements regarding potential acquisitions that fit into the company's *targeted global growth strategy*. It goes without saying that these agreements will be subject to due diligence and financing approval.

Taking into account GDSI's various lines of business and assuming these additional strategic acquisitions move forward as expected, the company now anticipates that if it closes the potential acquisitions, it may achieve an annual revenue run rate between $60 million and $75 million during the first quarter of 2014.

Today's announcement continues the company's ongoing effort to keep the public apprised of all important developments related to implementing GDSI's global growth strategy as outlined in the Open Letter from Richard J. Sullivan, GDSI's President and CEO, on October 29, 2013. The entire Open Letter to the Public is available on GDSI's website at http://gdsi.co/rjs_open_letter.html.

---

[8] *See* http://www.prnewswire.com/news-releases/global-digital-solutions-inc-offering-additional-details-to-the-public-about-strategic-plans-and-expected-near-term-results-anticipates-several-targeted-acquisition-agreements-in-the-fourth-quarter-of-2013-and-an-annual-reven-232044971.html (last accessed September 8, 2016).

"We're making this additional information publicly available in the interests of fairness and complete transparency," said Richard J. Sullivan, GDSI's President and CEO. "We believe it's important to let everyone know what actions we're taking to implement our strategy, which I outlined in my Open Letter recently.  We're actively engaged in several exciting, strategically significant discussions that we believe will come to fruition in the fourth quarter of 2014.  Taking everything into account, *we now expect GDSI to achieve an annual revenue run rate of between $60 million and $75 million in the first quarter of next year*.  This is very important information and we believe we have an obligation to publicly disclose our plans and expectations."

### About Global Digital Solutions, Inc.

Global Digital Solutions is positioning itself as a leader in providing cyber arms manufacturing, complementary security and technology solutions and knowledge-based, cyber-related, culturally attuned social consulting in unsettled areas.  For more information please visit http://www.gdsi.co.

117.    The Company's statements in the 11/15/13 Press Release were false and misleading at all relevant times and such falsity was known to the Individual Defendants.  For example, Global Digital's revenue projections were false and misleading, and it had no basis for them.  During the fourth quarter of 2013, Global Digital had only $509,224 in cash and no credible financing in place to acquire any of these companies.  Moreover, Global Digital only undertook financial due diligence on one company after the issuance of the 11/15/13 Press Release.

118.    Global Digital never acquired any of the companies referenced in the 11/15/13 Press Release and yet never informed the public that their projected annual revenue would not be reached.

### March 11-12, 2014 – Manufactured Hype over Alleged Deal with Remington

119.    On March 11, 2014, the Company issued a press release titled, "Global Digital Solutions Files Form 8-K, Announces Unsolicited Letter of Intent to Acquire Remington Outdoor Company, with Estimated Annual Sales of $1.25 Billion and a Purchase Price of Approximately $1.082 Billion," and containing the headline, "Form 8-K filing also provides information on

- 37 -

proposals to acquire two additional U.S.-based companies - a technology firm with annual revenue of approximately $25 million and a distribution company with annual revenue of approximately $30 million - and a status update of GDSI's transactions with Airtronic USA, Inc." (the "3/11/14 Press Release").

120.  This was tremendous news because Remington Outdoor Company, Inc. ("Remington"), also known as Freedom Group, Inc., is the largest gun company in America.

121.  The 3/11/14 Press Release stated the following, in relevant part:

PALM BEACH, Fla., March 11, 2014 /PRNewswire/ -- Global Digital Solutions, Inc. (OTC-QB: GDSI), a company that is positioning itself as a leader in providing cyber arms manufacturing, complementary security and technology solutions and knowledge-based, cyber-related, culturally attuned social consulting in unsettled areas, today filed a Form 8-K with the Securities and Exchange Commission ("SEC") providing information regarding *three proposed transactions*, including an unsolicited letter of intent to acquire Remington Outdoor Company, Inc., also known as Freedom Group, Inc. ("Freedom"). GDSI has made an unsolicited offer to purchase Freedom for $1.082 billion in cash and shares of GDSI's common stock. Freedom has estimated that its net sales for 2013 will be in the range of $1.250 billion to $1.275 billion and that its adjusted EBITDA will be in the range of $235 million to $240 million. The Form 8-K may be accessed at www.sec.gov or on GDSI's website at www.gdsi.co.

*Richard J. Sullivan, GDSI's Chairman and CEO, offered several reasons for optimism regarding the proposed acquisitions discussed in the Form 8-K filing and the company's overall strategy for profitable growth going forward*:

"The GDSI team is *extremely excited* and *confident about all three of these proposed acquisitions*. There are powerful synergies between Freedom and the two other companies that will fuel our future growth along with the transformation of the cyber arms industry. Cyber-based technologies, coupled with enhanced digital product development and distribution, will be key factors in achieving results that could match – and probably even exceed – what we were able to produce at Digital Angel Corp and Applied Digital Solutions ("Applied"). At Applied, we saw our market capitalization reach $2.5 billion, roughly five times revenue and *nearly 25 times EBITDA*.

"*Results like these truly represent the baseline of our expectations going forward*. As discussed previously, we plan to follow a similar acquisition strategy to the one we successfully pursued at Applied. Under my leadership at Applied, the GDSI team

- 38 -

successfully executed a private-to-public company roll-up totaling some 42 acquisitions and growing annual revenue from $1 million to $350 million over five years.

"This model, which takes advantage of market trends, technological advances and industry consolidations to fuel profitable growth, presents a value proposition that is perfectly suited to the military armament industry, an industry that is heavily fragmented and evolving rapidly toward a RFID/WiFi-enabled technology platform. In this dynamic environment, we see enormous opportunity to consolidate this market with a program of targeted acquisitions, including the proposed Freedom transaction. Technological convergence is the future in the cyber/smart arms arena and we're eager to leverage our proven history of success by helping Freedom and others navigate the transition from analog to digital.

"Our team plans to drive unprecedented consolidation and convergence in the cyber arms arena at least in part through the acquisition strategy outlined in our Form 8-K filing and elsewhere. We'll also do this by leveraging technologies like GDSI Gatekeeper, which we announced on January 23, 2014. Gatekeeper represents a revolutionary suite of technology-enhanced services that offer personalized, digital small arms safety and security solutions in commercial and military-related markets.

"The bottom line is: Our excitement and confidence derive from the fact that we've done this before and we see enormous potential that we'll be able to do it again."

As described in the Form 8-K, GDSI has also entered into non-binding letters of intent relating to the proposed acquisitions of two privately held, U.S.-based companies. One involves a technology and development services firm with annual revenue of approximately $25 million. The other is a military and law enforcement supply and distribution company with annual revenue of approximately $30 million.

**All three proposed acquisitions are subject to completion of due diligence, completion of satisfactory acquisition agreements and other customary conditions, including financing.**

The Form 8-K also provides an update regarding GDSI's transactions with Airtronic USA, Inc.

## More About Richard J. Sullivan and Applied Digital Solutions, Inc.

Dick Sullivan is an entrepreneurial pioneer. In 1970, he was a founding member of the management team of Manufacturing Data Systems, Inc., which listed at $7.50 per share and was sold to Schlumberger N.V. in 1980 at $65 per share. In 2001, Sullivan received the prestigious World Economic Forum's "Award for Advanced Chip Technology" presented in Davos, Switzerland. During Sullivan's decade-long tenure as Chairman and CEO, Applied was recognized as one of the country's fastest-growing technology companies, regularly topping the NASDAQ in trading volume. The company's stock price rose sharply from $2.50 to $18.00 per share, reaching a peak market capitalization of

approximately $2.5 billion. The company spawned two more successful public companies – Digital Angel Corporation and Verichip.

Continuous R&D at Applied, fueled by a series of high-tech acquisitions and steady corporate profits, yielded very impressive results, including:

- The first-ever FDA-approved, human-implantable RFID tags that continue to be used by several foreign militaries;

- The first proof-of-concept implanted GPS-wireless tracking device which was successfully implanted in a sheep in 2002; and

- The first-of-their-kind GPS-wireless tracking devices still sold to and used by probation and corrections offices around the country.

In addition, Applied was the subject of two Harvard Business School case studies that are still being used in the curriculum. The first followed the company's efforts to build a marketing plan for its Digital Angel GPS/wireless personal security device. The second study followed the successful merger of Digital Angel Corporation and Outerlink Corporation.

## About Remington Outdoor Company, Inc. (Freedom Group, Inc.)

Freedom describes itself as the world's leading innovator, designer, manufacturer and marketer of firearms, ammunition and related products for the hunting, shooting sports, law enforcement and military markets. It indicates that, as one of the largest manufacturers in the world of firearms and ammunition, it has some of the most globally recognized brands including Remington®, Bushmaster® Firearms, DPMS/Panther Arms™, Marlin®, H&R®, The Parker Gun™, Mountain Khakis®, Advanced Armament Corp.®, Dakota Arms®, Para™ USA and Barnes® Bullets. Additional information about Freedom is available by visiting www.freedom-group.com.

## About Global Digital Solutions, Inc.

Global Digital Solutions is positioning itself as a leader in providing cyber arms manufacturing, complementary security and technology solutions and knowledge-based, cyber-related, culturally attuned social consulting in unsettled areas. For more information please visit http://www.gdsi.co.

122.    Notably, the Company omitted any mention of Defendant R. Sullivan's checkered past, including his involvement in "pump and dump" schemes, in his lengthy biography in the 3/11/14 Press Release.

- 40 -

123.    The Form 8-K referred to in the 3/11/14 Press Release was one that the Company filed with the SEC on the same day, which was signed by Defendant R. Sullivan and attached the 3/11/14 Press Release (the "3/11/14 8-K").

124.    The 3/11/14 8-K, stated the following, in relevant part:

The Company has entered into two non-binding letters of intent relating to proposed acquisitions, and has submitted a non-binding proposal for another acquisition, as described below. As such letters of intent and proposal are subject to various conditions, the Company is not able to predict the likelihood of completion of any or all such transactions. However, if these transactions are completed, they will materially affect the business and financial condition of the Company.

***

**The Freedom Group Proposal.** The Company submitted a non-binding proposal, dated January 27, 2014, for the acquisition of the Remington Outdoor Company, Inc., also known as Freedom Group, Inc. ("Freedom"). *The Company received no response to such proposal and, by its terms, it expired on February 17, 2014*. In order to facilitate discussions, the Company has revised its proposal by leaving certain basic terms open for future negotiations and submitted a revised non-binding proposal, dated March 10, 2014. Under the proposal, the Company would offer consideration valued at eight times the 2013 consolidated EBITDA of Freedom and its specified subsidiaries less long term indebtedness. The Company estimates such EBITDA at $237.5 million and such long-term indebtedness at $818 million, which would result in total consideration of $1,082 million. Such amount would be subject to determination and adjustment as described in the proposal. Freedom has estimated that its net sales for 2013 will be in the range of $1,250.0 million to $1,275.0 million and that its adjusted EBITDA will be in the range of $235.0 million to $240.0 million.

***

**Private Company 1 Letter of Intent.** The Company entered into a non-binding letter of intent with a private company ("PC1"), in Q4 2013, under which the Company would acquire PC1 at a price, to be paid in cash, equal to six times PC1's 2013 EBITDA, determined as described in the letter of intent, and subject to adjustment based on the audited financial statements of PC1 for 2013. PC1's unaudited revenue for 2013 was approximately $30 million and unaudited EBITDA was approximately $2.6 million. Based on the Company's estimate of the EBITDA determined pursuant to the letter of intent, the purchase price would be $15.62 million.

***

- 41 -

**Private Company 2 Letter of Intent.** The Company also entered into a non-binding letter of intent with another private company ("PC2"), in Q4 2013, under which the Company would initially acquire 80% of the outstanding shares of PC2 for a purchase price, payable partly in cash and partly in shares of the Company, based on a ten times multiple of the EBITDA of PC2 for specified fiscal years, to be determined, and subject to adjustment, as described in the letter of intent.

125.    On March 12, 2014, the Company filed a Form 8-K/A with the SEC, which was signed by Defendant Loppert, to correct certain statements made in the 3/11/14 Press Release (the "3/12/14 8-K/A").

126.    The 3/12/14 8-K/A announced that the Company "omitted certain information" in the 3/11/14 Press Release and were thus filing a corrected press release.

127.    The 3/12/14 8-K/A attached a corrected press release (the "3/11/14 Corrected Press Release") that was nearly identical to the 3/11/14 Press Release except that the first paragraph, second sentence, of the press release stated that "GDSI has made an unsolicited offer to purchase Freedom for $1.082 billion in cash and shares of GDSI's common stock," rather than "GDSI has made an unsolicited offer to purchase freedom for $1.082 billion in cash," which appeared in the 3/11/14 Press Release.

128.    Thus, the 3/11/14 Corrected Press Release clarified that the Company's alleged offer to purchase Remington offered cash *and stock*, rather than just cash as stated in the 3/11/14 Press Release. This fact was material because the Individual Defendants knew that Remington was only interested in an *all-cash* offer.

129.    The 3/11/14 Corrected Press Release explained its correction as follows:

/C O R R E C T I O N -- Global Digital Solutions, Inc./

In the news release, Global Digital Solutions Files Form 8-K, Announces Unsolicited Letter of Intent to Acquire Remington Outdoor Company, with Estimated Annual Sales of $1.25 Billion and a Purchase Price of Approximately $1.082 Billion, issued 11-Mar-2014

- 42 -

by Global Digital Solutions, Inc. over PR Newswire, we are advised by the company that the first paragraph, second sentence, should read "GDSI has made an unsolicited offer to purchase Freedom for $1.082 billion in cash and shares of GDSI's common stock," rather than "GDSI has made an unsolicited offer to purchase freedom for $1.082 billion in cash," as issued inadvertently.

130.   No other correction was noted by the Company in the 3/11/14 Corrected Press Release, and indeed no other correction was made despite the fact that the 3/12/14 8-K/A stated that the Company "omitted certain information" from the 3/11/14 Press Release.  The 3/11/14 Corrected Press Release was identical to the 3/11/14 Press Release in all other respects.

131.   The Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact in the 3/11/14 8-K, the 3/11/14 Press Release, the 3/12/14 8-K/A, and the 3/11/14 Corrected Press Release (collectively, the "March 2014 Announcements").   The statements referenced above in the March 2014 Announcements were false and misleading.

132.   During the first quarter of 2014 Global Digital had less than $272,000 in cash and had no credible financing options to acquire, *inter alia*, Remington.  Thus, it was, at best, misleading to publicly announce an offer to purchase Remington for over $1 billion.

133.   Moreover, Defendant R. Sullivan and Loppert knew as early as January 2014 that Remington only wanted a fully-financed, *cash-only deal* and the investment bank assisting Global Digital in presenting the offer never attempted to find financing options for the Remington deal because the parties did not have a signed offer letter.  Moreover, Defendants R. Sullivan and Loppert knew the Remington offer had been repeatedly rejected.  For these reasons, Defendant R. Sullivan had no reason to be "excited" or "confident" about the proposed Remington acquisition.

134.    More specifically, Global Digital received various communications from the investment banker representing Remington's shareholders, and these communications were always consistent: Remington had no interest at all in Global Digital's offer; the investment banker repeatedly told Global Digital's investment banker that Remington was only interested in a fully-financed, cash-only deal; Remington rejected the deal on several occasions, including after the January 27, 2014 offer and the March 10, 2014 offer. Remington's investment banker relayed these rejections to Global Digital's investment banker, who communicated these rejections to Defendants R. Sullivan and Loppert prior to the release of the 3/12/14 8-K/A.

135.    The Company was explicitly called out for its lies, and the truth was partially disclosed when, on March 12, 2014, Bloomberg, and various other news outlets, reported on an internal memorandum (the "Remington Memo") that was sent out by Remington's CEO and Chairman to employees, which dismissed Global Digital's offer as a publicity stunt that lacked any credibility (the "Bloomberg Report").[9]

136.    The Bloomberg Report disclosed that the Remington Memo explained that "[a] small, unknown investment entity publicly announced its desire to acquire the Remington Outdoor Company." The Remington Memo continued, "If this wasn't disruptive to our employees and customers, we would not acknowledge the news and recognize it for what it is: a publicity stunt from an agenda-driven group with no credible financing options." The Company did not disclose or address Remington's comments in the Remington Memo.

---

[9] Paul M. Barrett, *From Out of the Blue, a $1 Billion Bid for America's Biggest Gun Company* (March 12, 2014), Bloomberg, http://www.bloomberg.com/news/articles/2014-03-12/cerberus-gets-a-1-billion-bid-for-americas-biggest-gun-company (last accessed September 8, 2016).

- 44 -

137.    The Bloomberg Report also noted that the spokeswoman for the Chamber of Commerce in Huntsville, Ala. stated the following about Global Digital's announcement: "[State authorities] have emphatically stated Remington is not in negotiations on this. It has been characterized as a PR play for a company known to be anti-firearms."  Indeed, as noted in the Bloomberg Report, Remington described the Global Digital offer as "attention seeking in its worst form."

138.    On this news, shares of the Company fell $0.13 per share or over 15% over the next two days to close at $0.73 per share on March 14, 2016.

139.    Adding insult to injury, Global Digital failed to consummate either of the other two deals referenced in the March 2014 Announcements.  No subsequent disclosures were made to inform the public that these acquisitions did not move forward.

### March 28, 2014 – Global Digital Doubles Down and Reiterates Its Lies

140.    On March 28, 2014, the Company filed an annual report for the fiscal year ended December 31, 2013 on a Form 10-K with the SEC (the "2013 10-K"), which was signed by Defendants R. Sullivan, Loppert, Delgado, Noterman, and S. Sullivan.

141.    Attached to the 2013 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants R. Sullivan and Loppert attesting to the accuracy of the 2013 10-K.

142.    The Company's SOX certifications contain the following attestations:

1.    I have reviewed [the attached filing] of Global Digital Solutions, Inc.:

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

- 45 -

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

- 46 -

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

143.    Even in the face of the Bloomberg Report and the Remington Memo, the Company, in its 2013 10-K, doubled down on its previous false and misleading statements in the March 2014 Announcements. The 2013 10-K stated the following about the deal with Remington:

> **The Freedom Group Proposal.** We submitted a non-binding proposal, dated January 27, 2014, for the acquisition of Remington Outdoor Company, Inc., also known as Freedom Group, Inc. ("Freedom"). *We received no response to such proposal* and, by its terms, it expired on February 17, 2014. In order to facilitate discussions, we revised our proposal by leaving certain basic terms open for future negotiations and submitted a revised non-binding proposal, dated March 10, 2014. Under the proposal, the Company would offer consideration valued at eight times the 2013 consolidated EBITDA of Freedom and its specified subsidiaries less long term indebtedness. The Company estimates such EBITDA at $237.5 million and such long- term indebtedness at $818 million, which would result in total consideration of $1.082 billion. Such amount would be subject to determination and adjustment as described in the proposal. Freedom has estimated that its net sales for 2013 will be in the range of $1.250 billion to $1.275 billion and that its adjusted EBITDA will be in the range of $235 million to $240 million.
>
>                         \*\*\*
>
> *The Company has not received a response to this proposal. However, the Company intends to continue efforts to enter into discussions with a view to moving forward with this proposal.* As indicated above, the Company is not able to predict the likelihood of completion of this transaction or of any other transaction involving Freedom.

144.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact in the 2013 10-K. The Individual Defendants knew that the Company had no chance of consummating the Remington offer and had no means of financing such an acquisition. In fact, no deal was ever consummated and no correction was ever issued. Defendants R. Sullivan, Loppert, Delgado, Noterman, and S. Sullivan were fully aware that Remington's CEO/Chairman dismissed the Company's offer, and yet all of the aforementioned Individual Defendants signed the 2013 10-K.

145.     The Individual Defendants failed to change any of the representations made in the 3/11/14 Corrected Press Release, even when given the opportunity to do so in the 2013 10-K.

## May 13, 2016 – Resignations of Key Company Officers and Directors

146.     On May 16, 2016, the Company filed a Form 8-K with the SEC, signed by Defendant R. Sullivan, (the "5/16/16 8-K") announcing that effective May 13, 2016, Defendant R. Sullivan resigned as CEO and Chairman of the Company and his daughter, Defendant S. Sullivan, and Defendant Noterman resigned as directors of the Company.

147.     The 5/16/16 8-K also announced that Defendant Delgado was appointed to the position of CEO and Chairman, a position which he previously held from August of 2004 through August of 2013.

## The Truth Emerges – SEC Files Complaint Against the Company

148.     On August 11, 2016, the SEC announced that it charged the Company and Defendants R. Sullivan and Loppert with defrauding investors by issuing false and misleading press releases purporting that the company was a budding leader in cyber arms manufacturing and security technology solutions.[10]

149.     It is reasonable to assume that the May 13, 2016 resignations of the Company's top officers and directors was a result of the Company being notified that the SEC was going to file an action against the Company and its top officers.  Yet, at no time before August 11, 2016 did the Company disclose that it was being investigated by the SEC or that it had received notice from the SEC of an impending action against the Company.

---

[10] *See* https://www.sec.gov/litigation/litreleases/2016/lr23618.htm (last accessed September 8, 2016).

150.    According to the SEC's complaint in the matter of *Securities and Exchange Commission v. Global Digital Solutions, Inc. et al.*, No. 16-cv-81413 (S.D. Fla. filed August 11, 2016) (the "SEC Action"), Defendants R. Sullivan and Loppert were behind the press releases and corporate filings that falsified Global Digital's operations and revenue projections when in reality it had no customers, never manufactured any cyber arms, and never provided any security technology services or solutions.

151.    The SEC's press release announcing its complaint stated the following about its complaint:

The SEC's complaint alleges:

- Global Digital publicly announced in several press releases in October 2013 that one of its merger targets had become the exclusive original manufacturer of sophisticated grenade launchers for a major international client under a private label agreement with a first stage value of approximately $95 million.

- In November 2013, Global Digital issued a press release projecting future annual revenue of $60 million to $75 million during the first quarter of calendar year 2014.

- In March 2014, Global Digital announced in filings and press releases that it had made an unsolicited letter of intent to acquire one of the country's largest arms manufacturers for $1.082 billion.

In fact, as alleged in the SEC's complaint, all of these statements were false; the private label agreement announced in October 2013 did not exist, there was no basis for Global Digital's November 2013 future annual revenue projection, and Global Digital operated out of a virtual office, had only $509,224 in cash and a $1.4 million note receivable, had no revenues or operations, lacked any credible, imminent, financing options and its offer to purchase the arms manufacturer announced in March 2014 had been immediately rejected.

The SEC's complaint alleges that Global Digital, Sullivan and Loppert violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(b) thereunder, and Section 17(a)(2) of the Securities Act of 1933. The complaint also alleges that Global Digital violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-11 thereunder and that Sullivan and Loppert aided and abetted these violations. The complaint also alleges that Sullivan and Loppert violated Rule 13a-14 of the Exchange Act and

- 49 -

Section 16(a) of the Exchange Act and Rule16a-3 thereunder. The Commission's complaint seeks permanent injunctions and civil penalties against all defendants, disgorgement with prejudgment interest against Global Digital, and officer and director bars and penny stock bars against Sullivan and Loppert.

152.    The Complaint in the SEC Action ("SEC Complaint") is hereby incorporated by reference as if set forth fully herein.

153.    The SEC Complaint also alleged that Defendants R. Sullivan and Loppert failed to file statements of beneficial ownership of securities on Forms 3, 4, and 5.  Specifically, the SEC Complaint alleges the following:

> Global Digital became an effective reporting company with the Commission on October 10, 2013. At that time, both Sullivan and Loppert owned shares of Global Digital stock, and both failed to file an Initial Statement of Beneficial Ownership, known as Form 3.
>
> On March 5, 2014, Sullivan was granted 3 million stock options of Global Digital stock and Loppert was granted 1.5 million. Neither filed a Statement of Changes in Beneficial Ownership of Securities, known as Form 4.
>
> As indicated in Global Digital's Form 10-K, dated March 30, 2015, Sullivan owned 30,240,000 shares of Global Digital Stock and Loppert owned 9,500,000. Together both Sullivan and Loppert owned just over 36% of Global Digital stock as of March 26, 2015. At no time did Sullivan or Loppert file an Annual Statement of Beneficial Ownership of Securities, known as Form 5.

## Summary of the Individual Defendants' Wrongful Conduct

154.    In breach of their fiduciary duties owed to Global Digital, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact as alleged above.  These facts pertained to the Company's business, operations, and prospects and were known to the Individual Defendants or recklessly disregarded by them.  The Company's statements and representations, referenced above were materially false and misleading at all relevant times.  Moreover, the Individual Defendants

failed to adequately correct those false and misleading statements and/or omissions of material fact.

155.   In further breach of their fiduciary duties owed to Global Digital, the Individual Defendants, who collectively controlled the Company, willfully or recklessly grossly mismanaged the Company and its affairs, wasted corporate assets, and operated the Company as a shell to benefit themselves. Also, the Company, under the control of the Individual Defendants, appointed woefully unqualified individuals to the Board, such as Defendant S. Sullivan.  And further, the Company grossly overcompensated directors and officers, including Defendant Norris, who was paid $3,630,000 in compensation from the Company in 2014 for only five months of service.

156.   In further breach of their fiduciary duties owed to Global Digital, the Individual Defendants willfully or recklessly caused the Company to sell at least $50,000 worth of Company stock at artificially inflated prices, while causing the Company to increase their own salaries, bonuses, fees, and Company stock holdings.

## DAMAGES TO GLOBAL DIGITAL

157.   As a direct and proximate result of the Individual Defendants' conduct, Global Digital will lose and expend many millions of dollars.

158.   Such expenditures include, but are not limited to, legal fees associated with the Securities Fraud Class Action filed against the Company and Defendants Delgado, R. Sullivan, Loppert, Noterman, and S. Sullivan and the SEC Action filed against the Company and Defendants R. Sullivan and Loppert, amounts paid to outside lawyers, accountants, and investigators in connection thereto, and losses of revenues caused by investors' and future customers' loss of trust in the Company's business and products.

159.   Such costs include, but are not limited to compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

160.   As a direct and proximate result of the Individual Defendants' conduct, Global Digital has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

161.   Plaintiff brings this action derivatively and for the benefit of Global Digital to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Global Digital and unjust enrichment, as well as the aiding and abetting thereof.

162.   Global Digital is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

163.   Plaintiff is, and at all relevant times has been, a Global Digital shareholder.  Plaintiff will adequately and fairly represent the interests of Global Digital in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

164.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

165.    A pre-suit demand on the Board of Global Digital is futile and, therefore, excused. At the time of filing of this action, the Board consists solely of Defendant Delgado, the Company's CEO and Chairman.

166.    Defendant Delgado faces a substantial likelihood of liability as a result of his engagement, either knowingly or recklessly, in schemes to (1) grossly mismanage the Company and its assets so as to benefit the Individual Defendants, and (2) make and/or cause the Company to make false and misleading statements and omissions of material fact as alleged above. Defendant Delgado's substantial likelihood of liability in this and the Securities Fraud Class Action renders him unable to impartially investigate the charges and decide whether to pursue action against himself and the other perpetrators of the schemes.

167.    Defendant Delgado knowingly or recklessly participated in the conduct alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, Defendant Delgado breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and demand upon him is futile, and thus excused.

168.    Additional reasons that demand on Defendant Delgado is futile follow. Defendant Delgado is the Company's CEO, and is thus, as the Company admits, a non-independent director.[11] Indeed, Defendant Delgado was the Company's CEO and Chairman at all relevant times until August 2013, when he appointed Defendant R. Sullivan to the top officer position, and then reassumed that position on May 13, 2016. During his tenure as CEO, Defendant Delgado was

---

[11] Indeed, on the issue of independence, the Company disclosed in the 2014 10-K that the Board has determined that only Defendant Noterman was independent under the NASDAQ Stock Market Listing Rules.

ultimately responsible for all of the wrongful conduct that occurred, including the self-dealing described herein. But even as a director between August 2013 and May 2016, Defendant Delgado actively participated in all of the wrongful conduct described herein. For example, Defendant Delgado approved the appointment of Defendant S. Sullivan to the Board despite her being absolutely unqualified to serve as a director of a publicly traded company, except that she was Defendant R. Sullivan's daughter. And at the very least, Defendant Delgado is responsible for all of the false and misleading statements and omissions that were made in the 2013 10-K, which he signed. Defendant Delgado's large Company stock holding, worth at least $3.8 million during the Relevant Period reveals his interest in keeping the Company's stock price as high as possible. Moreover, Defendant Delgado is a defendant in the Securities Fraud Class Action. Finally, Defendant Delgado conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Delgado breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169.    Defendant Delgado as an employee and/or director of the Company, was and is subject to the Code of Ethics. The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict with the Company's interests or adversely affect the Company's reputation. As described herein, Defendant Delgado did not

- 54 -

comply with the requirements of the Code of Ethics. Defendant Delgado violated the Code of Ethics because he knowingly or recklessly participated and/or acquiesced in the wrongful conduct described herein. Because Defendant Delgado violated the Code of Ethics, he faces a substantial likelihood of liability for breaching his fiduciary duties, and therefore demand upon him is futile.

170.   Defendant Delgado has longstanding business and personal relationships with each of the Individual Defendants that precludes him from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Delgado was lining Defendant R. Sullivan's pockets before Defendant R. Sullivan even joined Global Digital. In December 2012 the Company entered into an agreement with an investor to lend it $750,000. As part of that agreement, Bay Acquisition LLC, an entity controlled by Defendant R. Sullivan, pledged certain collateral as additional security for the loan. In consideration for this pledge of collateral, the Company issued to Bay Acquisition LLC *3,000,000 shares* of the Company's restricted common stock valued at $360,000. These conflicts of interest precluded Defendant Delgado from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' obvious and pervasive wrongful conduct. Thus, any demand on Defendant Delgado would be futile.

171.   Global Digital has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet Defendant Delgado has not filed any lawsuits against himself or the others who were responsible for that wrongful conduct to attempt to recover for Global Digital any part of the damages Global Digital suffered, and will continue to suffer, thereby. Thus, any demand on Defendant Delgado would be futile.

172.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, Defendant Delgado cannot claim exculpation from his violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As the entirety of the Board faces a substantial likelihood of liability and is self-interested in the transactions challenged herein, it cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

173.    The acts complained of herein constitute violations of fiduciary duties owed by Global Digital's officers and directors, and these acts are incapable of ratification.

174.    Defendant Delgado may also be protected against personal liability for his acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if he caused the Company to purchase it for his protection with corporate funds, i.e., monies belonging to the stockholders of Global Digital.  If there is a directors' and officers' liability insurance policy covering Defendant Delgado, it may contain provisions that eliminate coverage for any action brought directly by the Company against directors and/or officers of the Company, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if Defendant Delgado were to sue himself or certain of the former officers or directors of Global Digital, there would be no directors' and officers' insurance protection.  Accordingly, Defendant Delgado cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery. Thus, demand on Defendant Delgado is futile and, therefore, excused.

175.    If there is no directors' and officers' liability insurance, Defendant Delgado will not cause Global Digital to sue the Individual Defendants named herein, since, if he did, he would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

176.    Thus, for all of the reasons set forth above, Defendant Delgado, as the entire Board, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

177.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Global Digital's business and affairs.

179.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

180.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Global Digital.

181.    In breach of their fiduciary duties owed to Global Digital, the Individual Defendants willfully or recklessly caused the Company to, *inter alia*, (1) grossly mismanage the Company and

its assets so as to benefit themselves, and (2) make and/or cause the Company to make false and misleading statements and omissions of material fact as alleged herein. The Individual Defendants failed to rectify and/or cause the Company to rectify any of the wrongs described herein and failed to correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

182.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Global Digital's securities and obtaining maximal investor funding under false pretenses.

183.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Global Digital's securities and obtaining maximal investor funding under false pretenses.

- 58 -

184.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

185.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Global Digital has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

186.    Plaintiff on behalf of Global Digital has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

187.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188.    By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Global Digital.

189.    The Individual Defendants either benefitted financially from the improper conduct and received unjustly lucrative bonuses tied to the false and misleading statements and omissions, or received cash, stock options, or similar compensation from Global Digital that was tied to the performance or artificially inflated valuation of Global Digital, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. Indeed, the Individual Defendants received grossly excessive compensation.

190.    Plaintiff, as a shareholder and a representative of Global Digital, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits and other compensation, including any performance-based or valuation-

based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

191.    Plaintiff on behalf of Global Digital has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

192.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Global Digital, for which they are legally responsible.

194.    As a direct and proximate result of the Individual Defendants' abuse of control, Global Digital has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Global Digital has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

195.    Plaintiff on behalf of Global Digital has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

196.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of Global Digital in a manner consistent with the operations of a publicly-held corporation.

198.    The Individual Defendants, who collectively controlled the Company, willfully or recklessly grossly mismanaged the Company and its affairs and operated the Company as a shell to benefit themselves.  The Individual Defendants (1) engaged in self-interested transactions without following appropriate protocols to ensure that the best interests of the Company were being served, (2) caused the Company to appoint woefully unqualified individuals to the Board, such as Defendant S. Sullivan, and (3) caused the Company to grossly overcompensate directors and officers, including but not limited to Defendant Norris, who was paid $3,630,000 in compensation from the Company in 2014 for only five months of service.

199.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Global Digital has sustained and will continue to sustain significant damages.

200.    Moreover, as a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company's stock has plummeted from nearly $1.00 to just over one tenth of a penny (i.e. $0.0014)!

201.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

202.    Plaintiff, on behalf of Global Digital, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

203.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

204.    As a result of the foregoing, by failing to properly consider the interests of the Company and its public shareholders, and by grossly overcompensating directors and officers of the Company, the Individual Defendants have caused Global Digital to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors who no longer trust the Company.

205.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

206.    Plaintiff on behalf of Global Digital has no adequate remedy at law.

## REQUEST FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Global Digital, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Global Digital;

(c)    Determining and awarding to Global Digital the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

- 62 -

(d)    Directing Global Digital and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Global Digital and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Global Digital to nominate at least three new candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Global Digital restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 24, 2017                     Respectfully submitted,

**PAWAR LAW GROUP P.C.**

- 63 -

Vik Pawar, Esq.
6 South Street, Suite 201
Morristown, New Jersey 07960
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vikrantpawaresq@gmail.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown, Esq.
127A Cove Road
Oyster Bay Cove, New York 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I, Adrian Lopez, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 9th day of September, 2016.

_____
Adrian Lopez