# EXHIBIT A



**STERNS & WEINROTH**
A Professional Corporation
50 West State Street, Suite 1400
P.O. Box 1298
Trenton, N.J. 08807
(609) 392-2100
Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ELLEN FAGIN and JUDITH FAGIN,
derivatively on behalf of MERCK & CO.,
INC., a New Jersey corporation and
MEDCO HEALTH SOLUTIONS,
INC., a Delaware corporation,

      Plaintiffs,

      v.

RAYMOND V. GILMARTIN, JUDY C.
LEWENT, WILLIAM B. HARRISON, JR.,
HEIDI G. MILLER, THOMAS E. SHENK,
SAMUEL O. THIER, RICHARD T.
CLARK, JOAN A. REED, RICHARD J.
RUBINO, LAWRENCE A. BOSSIDY,
JEANETTA B. COLE, WILLIAM N.
KELLY, WILLIAM G. BOWEN, NIALL
FITZGERALD, ANNE M. TATLOCK,
EDWARD M. SKOLNICK, and ARTHUR
ANDERSEN, LLP,

      Defendants,

      -and-
MERCK & CO., a New Jersey corporation
and MEDCO HEALTH SOLUTIONS,
INC., a Delaware corporation,

      Nominal Defendants.

**FILED**

AUG  5 2003

AT 8:30 _____
No. 03-WILLIAM T. WALSH (SRC) M
CLERK

**VERIFIED SECOND AMENDED
SHAREHOLDERS' DERIVATIVE
COMPLAINT AND
JURY TRIAL DEMAND**

03-cv-2631

S:\52433\00001\03plead\08MerckSecondAmendDerivCompt.doc

Plaintiffs allege upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief based upon, inter alia, a review of relevant filings made with the Securities and Exchange Commission ("SEC"), filings made in other judicial proceedings including U.S. ex rel. Hunt v. Merck & Co., Inc. et al., No. 99 CV 2332 (E. D. Pa.) and U.S. ex rel. Piacentile v. Merck & Co., Inc., et al., No. 00 CV 737 (E.D. Pa.) (hereinafter referred to as the "Qui Tam Actions"), press releases, news reports, and the investigation conducted by and through plaintiffs' counsel, as follows:

## INTRODUCTION AND OVERVIEW

1.  Plaintiffs are now, and at relevant times were, holders of the common stock of nominal defendant Merck & Co., Inc. ("Merck" or the "Company") which, in turn, currently owns all of the outstanding shares of nominal defendant Medco Health Solutions, Inc. ("Medco" or "MHS"). This action is brought derivatively for the benefit of the Company and double derivatively for the benefit of Medco against certain of the Company's and Medco's senior executives and directors, and seeks to remedy the damages caused to the Company by their wrongful conduct.

2.  MHS has actively and recklessly for several years pursued business strategies which violated the terms of its contractual agreements as well as federal and state law and also subjected its customers who had their prescriptions filled by Medco to health risks. This extended course of wrongful conduct is detailed in the Second Amended Qui Tam Complaint for False Claims Act Violations filed in the Qui Tam Actions. At the same time, Merck artificially inflated its reported revenues from its Medco operations in direct contravention of Generally Accepted Accounting Principles (GAAP), causing the Company to include in its reported revenue co-payments of more than $14 billion paid to third parties that the

2

Company never billed for or received.

3.    The senior executives named as defendants herein either actively or
recklessly pursued their own personal financial agenda for enrichment in the form of increased
compensation, bonuses and awards of stock options at the expense of the interests of Merck and
Medco. The director defendants named herein were at least grossly negligent in discharging
their duties as directors to oversee the operations of Merck and Medco in a manner designed to
insure compliance with their legal obligations.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this action based upon Merck's removal of
the original Complaint in this action to this Court from the Superior Court of New Jersey.

5.    Venue is properly laid in New Jersey pursuant to 28 U.S.C. §§ 1391(a),
1401 and 1441(a) because the acts performed in furtherance of the transactions complained of in
this action occurred in substantial part in this State, and the Company maintains its executive
offices and principal place of business in Whitehouse Station, New Jersey.

## PARTIES

**Plaintiffs**

6.    Plaintiffs Ellen Fagin and Judith Fagin are currently shareholders of the
Company and were shareholders of the Company at the time of the wrongdoings which are the
subject of this complaint.

**Nominal Defendants**

7.    (a)    Nominal defendant Merck is a New Jersey corporation with its
principal place of business located at One Merck Drive, Whitehouse Station, New Jersey. The
Company describes itself as a "global research-driven pharmaceutical company that discovers,

3

develops, manufactures and markets a broad range of human and animal health products, directly and through its joint ventures, and provides pharmaceutical benefit services through [Medco]. The Company's operations are principally managed on a products and services basis and are comprised of two reportable segments: Merck Pharmaceutical and Medco. Medco revenues are derived from the filling and management of prescriptions and health management programs."

(b)     The Company is named as a nominal defendant solely in a derivative capacity, and this action is brought to obtain a recovery and other appropriate relief on its behalf.

8.     (a)     Nominal defendant Medco Health Solutions, Inc. ("Medco" or "MHS") is a Delaware corporation formed through the conversion of its corporate predecessor, Merck-Medco Managed Care, L.L.C., a Delaware limited liability corporation, and is headquartered at 100 Parsons Pond Drive, Franklin Lakes, New Jersey.  Medco is reportedly the nation's largest pharmacy benefit manager, or PBM, based on its 2002 net revenues.  Medco claims to provide sophisticated programs and services for its clients and the members of their pharmacy benefit plans, as well as for the physicians and pharmacies the members use.

(b)     Medco is named as a nominal defendant solely in a derivative capacity, and this action is brought to obtain a recovery and other appropriate relief on its behalf.

**The Executive Defendants**

9.     Defendant Raymond V. Gilmartin ("Gilmartin") is, and at all relevant times was, Chairman of the Board, President and Chief Executive Officer of the Company.

10.     Defendant Judy C. Lewent ("Lewent") has, since February 2001 served as Executive Vice President and Chief Financial Officer of the Company and since April 2002 has acted as a manger/director of Medco.

4

11.     Defendant Richard T. Clark ("Clark") served as an Executive Vice President and Chief Operating Officer as well as a manager/director of Medco from June 1997, President from January 2000 through March 2003.

12.     Defendant JoAnn A. Reed ("Reed") has served as Senior Vice President of Finance of Medco since 1992 and Chief Financial Officer since 1996.

13.     Richard J. Rubino ("Rubino") has served as Medco's Vice President and Controller since June 1998 and is responsible for accounting and financial reporting. Rubino joined Medco in May 1993 and in July 1995 assumed the role of Vice President, Planning, with responsibility for financial, business and strategic planning.

14.     Defendants Gilmartin, Lewent, Clark, Reed and Rubino are hereinafter collectively referred to as the "Executive Defendants."

## The Audit Committee Defendants

15.     Defendants William B. Harrison, Jr. ("Harrison") Heidi G. Miller ("Miller"), Thomas E. Shenk ("Shenk"), and Samuel O. Thier ("Thier") are, and at all relevant times were, members of the Audit Committee of the Company's Board of Directors and are collectively referred to herein as the "Audit Committee Defendants." The Audit Committee oversees Merck's accounting, financial reporting process, internal controls and audits, and consults with management, the internal auditors, and the Company's independent public accountants on, among other things, matters related to the annual audit, the published financial statements and the accounting principles applied. The Audit Committee also monitors Merck's policies on ethical business practices.

**The Other Director Defendants**

16.     Defendants Lawrence A. Bossidy ("Bossidy"), Jeannetta B. Cole ("Cole"),
William N. Kelly ("Kelly"), William G. Bowen ("Bowen"), Niall Fitzgerald ("Fitzgerald"), Anne
M. Tatlock ("Tatlock") and Edward M. Skolnick ("Skolnick"), at times relevant to this
Complaint, were members of the Board of Directors of Merck and are collectively referred to
herein as the "Other Director Defendants." In addition, Skolnick was the Executive Vice
President of Science and Technology of Merck, and resigned from all his positions with Merck
effective January 1, 2003.

17.     The Other Director Defendants and the Audit Committee Defendants are
collectively referred to herein as the "Director Defendants." In their capacities as directors of
Merck, the Director Defendants, according to Merck's 2002 proxy statement, "ha[d] the legal
responsibility for overseeing the affairs of the Company and, thus, an obligation to keep
informed about the Company's business and strategies."

**Arthur Andersen**

18.     Defendant Arthur Andersen LLP ("Arthur Andersen") was, at times
relevant to this action, one of this country's largest public accounting firms, and acted as the
independent public auditor with respect to the financial statements of Merck and Medco.

## SUBSTANTIVE ALLEGATIONS

19.     Medco is a wholly-owned subsidiary of Merck, a pharmacy benefit
manager which, according to a Form S-1 registration statement filed with the Securities and
Exchange Commission ("SEC"), provides sophisticated programs and services for clients and the
members of their pharmacy plans, as well as for the physicians and pharmacies the members use.
This is primarily accomplished by negotiating competitive rebates and discounts from

pharmaceutical manufacturers, obtaining competitive discounts from retail pharmacies, and administering prescriptions filled through Medco's national networks of retail pharmacies or its own home delivery pharmacies. As part of the process, consumers generally make co-payments to their pharmacies to cover their portion of the cost of the prescriptions under an insurance plan. Typically, the pharmacy keeps the entire amount of the co-payment, and no amount is provided to Medco.

20.     The accuracy of the financial statements issued by Merck and its wholly-owned subsidiaries including Medco is the responsibility of senior management, including the Executive Defendants.

21.     On or about January 29, 2002, Merck announced plans to establish Medco as a separate, publicly-traded company. Merck planned an initial public offering ("IPO") of a portion of the new company by mid-2002, with a full separation of Medco completed within about 12 months of the IPO. The market reacted positively to the news of the IPO. Merck's stock price, which closed at $57.00 per share on January 28, 2002, increased each of the following few days, and closed at $59.43 per share on February 1, 2002.

22.     On February 26, 2002, the Company's Board and its Audit Committee decided to no longer engage Arthur Andersen as the Company's independent public accountants, and engaged Price Waterhouse Coopers LLP to serve as Merck's independent public accountants for the fiscal year 2002, subject to stockholder ratification. Arthur Andersen was subsequently convicted of obstruction of justice for shredding documents related to its audit of Enron Corp.

23.     On or about April 17, 2002, Merck filed a registration statement with the SEC for an IPO of Medco. Merck planned to sell approximately 20 percent of its Medco stake and raise about $1 billion. In addition, Medco was then to sell more than $1 billion in bonds,

7

providing the cash to Merck. J.P. Morgan Chase & Co. was to be one of the two lead underwriters of the IPO and one of three managers of the note sale.

24.     On or about June 13, 2002, Merck announced that it would offer up to 46,700,000 shares of common stock in the IPO. The IPO price was estimated to be between $22 and $24 per share.

25.     On or about June 21, 2002, it was first reported in The Wall Street Journal that Merck had boosted its reported revenue by billions of dollars by including co-payments as revenue. The co-payments were the amounts paid by consumers to their pharmacies to cover their portion of the cost of the prescription under an insurance plan. Typically, the pharmacy keeps the entire amount of the co-payment. No amount of the co-payment was provided to either Merck or Medco, yet the co-payments were being recorded as revenue by these entities. The Wall Street Journal reported that, though "neither Merck nor the Medco unit bills for the co-payments, or gets billed for the payments or otherwise comes into contact with them" they include the co-payments as revenue. It further reported that two of Merck's biggest competitors use a more conservative accounting method that does not include co-payments in their revenue.

26.     On or about June 27, 2002, it was announced that Merck delayed its IPO until the following week and was cutting the price range for the shares to $20 to $22 per share, down from $22 to $24 per share.

27.     On July 8, 2002, it was reported that Merck, in a filing the previous day with the SEC, admitted that it had booked $14.05 billion in revenue that it did not receive from January 1, 1999 to March 30, 2002. This revenue was approximately 10.5 percent of the Company's total sales in the relevant period. After the disclosure of the amount of co-payments that Merck booked as revenue, Patricia Hughes, a professor of accounting at the Anderson

8

School of Management at the University of California, Los Angeles, was quoted by <u>Bloomberg</u> <u>News</u> on July 8, 2002 as stating: "Merck never receives the cash at all. It seems definitely wrong that they're showing it as revenue. Many investors look at revenues, so that's certainly misleading." The more than $14 billion in sales that Merck booked, but did not receive, was used by the Company to determine executive bonuses which, according to Merck's proxy statement, were determined by comparing the Company's growth in revenue and earnings per share to that of certain other leading healthcare companies.

28.    On July 9, 2002, Merck withdrew its IPO, in part, reportedly, because of questions about Medco's accounting methods. The withdrawal came after the offering price had again been reduced, from $20 to $22 per share -- down, reportedly, to about $17 per share. Even at this lowered price, it was reported that investors were not buying the shares. It was estimated that the offering would raise less than $841 million at the lowered price or approximately $280 million less than initially planned, representing a 25% decrease in the funds that were to be raised. Merck then withdrew the IPO. A concomitant $1 billion issue of five and ten year notes, for which Chase was one of the underwriters, was also delayed. As an analyst at Northern Trust, Martin Bukoll, was quoted as stating that the issues surrounding Medco had "tarnished the silver that is Merck . . . ."

29.    The Company has asserted that the overstatement of revenues had no impact on Merck's reported earnings. However, even assuming the truth of that assertion, the Company has nonetheless sustained damages from the overstatement, including the following:

(a)    The bonus compensation and award of stock options to senior Merck executives including, without limitation, defendant Gilmartin, were based in part on reported revenues, according to the Company's most recent proxy statement. Because revenues

9

were overstated, those executives including defendants Gilmartin and Lewent, were over-compensated based on a mistake of fact.

(b)    The market price of Merck's common stock was artificially inflated, as evidenced by the drop in the price of the stock following the revelations of revenue overstatement. To the extent the Company repurchased its own common stock during the relevant period of time, either in open-market or private transactions, it overpaid and was damaged by the amount of the overpayments. In this regard, a July 23, 2002 press release by the Company stated that since February 2000, Merck had spent $7.7 billion to buy back 115.3 million shares of its own stock.

(c)    Merck has been sued in this Court in several now-consolidated securities fraud class actions seeking damages for investors who claim to have overpaid for Merck stock due to the revenue overstatement.

30.    On July 31, 2002, Merck announced that it was cancelling Medco's IPO.

31.    On December 9, 2002, Medco issued a press release, attached as an exhibit to a Form 8-K filed by Merck with the SEC in December 1999, announcing that it had agreed to settle a series of ERISA class action lawsuits pending in the United States District Court for the Southern District of New York for cash compensation of $42.5 million and modification of existing business practices that are designed to ensure clients have an understanding of, and realize maximum value for, their investment in pharmacy healthcare services.

32.    On or about May 29, 2003, Merck filed a registration statement on Form 10 with the SEC, and disclosed in a Form 8-K filed with the SEC, that it no longer intended to sell shares of Medco in a public offering. Instead, the announced plan provided for Medco to be

10

spun off from Merck, with shareholders of Merck receiving a pro-rata distribution of Medco shares.

33.     On June 23, 2003, Patrick Meehan, the U.S. Attorney for the Eastern District of Pennsylvania, announced that the federal government would be intervening in the Qui Tam Actions, and joined in the accusations of the plaintiffs in those actions of substantial wrongdoing by Medco. Joining in the qui tam actions were the states of Florida, California, Illinois, Tennessee, Texas, Michigan, Louisiana, Nevada, Massachusetts, and Virginia, as well as the District of Columbia. The action seeks substantial damages for violations of the False Claims Act, 31 U.S.C. §3729(a)(1)-(2).

34.     The Second Amended Qui Tam Complaint for False Claim Violations ("Qui Tam Complaint") filed in the Qui Tam Action, originally filed under seal on March 18, 2003, is 92 pages in length. Among the allegations set forth in the Qui Tam Complaint is the charge that upon acquiring control of Medco in 1996, Merck shifted away from good pharmacy practices to policies emphasizing revenue maximization by implementing policies improperly curtailing the role of pharmacists in properly filling prescriptions. Thus, contrary to previous good pharmacy practices, licensed pharmacists were no longer reading and verifying mailed prescriptions before they were entered into a computer. Instead, the prescriptions were entered by data entry clerks with no formal pharmacy training. Prescriptions were filled with unreliable automated machinery and pharmacists were no longer checking each prescription to insure that bottles had the correct prescription and pill count. These policies are alleged to have caused payers for prescription drugs and health care, including the state and federal governments, to have been fraudulently billed for pharmacy services which were either not rendered, or which were rendered well below quality standards. In addition, the system adopted by Merck for use at

11

Medco caused prescription tablet and capsule counts often to be inaccurate, and for the illegal use of returned drugs.

35.     The Qui Tam Action alleges that Medco caused its employees to permanently delete, cancel, or otherwise falsify prescription orders to meet contractual performance guarantees. Deleting this information made it appear that Medco's mail order facilities had fewer backorders, and allowed Medco to avoid paying contractual performance penalties.

36.     Medco and Merck utilized a Managed Care Department to switch patients to targeted drugs which did not benefit them but, instead, increased Merck-Medco's profitability through lucrative contracts with drug manufacturers all over the country. This procedure resulted in customers, including state and federal governments, being charged fees for Managed Care Services that were not being rendered as represented, and for being charged for drug switching services, which increased the cost to payees while benefiting Merck-Medco. The amount of profits from such unlawful conduct is alleged to be *hundreds of millions of dollars per year.*

37.     The Qui Tam Complaint also alleges that Medco charged for drug utilization reviews it never performed, falsified doctor call performance reports, and charged for customer services that were either not rendered or that were rendered below minimum professional standards.

38.     Aside from the $42.5 million which Medco has already agreed to pay to settle certain ERISA class actions, the conduct detailed in the Qui Tam Complaint and other questionable conduct have exposed Medco and Merck to substantial additional potential liability.

39.     The recently filed Amendment No. 6 to Form S-1 registration statement of

12

Medco contains a section titled "Risks Relating to Our Business." The initial risk, according to

the registration statement (page 23), is that "**Pending and threatened litigation challenging**

**some of our important business practices could significantly negatively affect our ability to**

**obtain rebates that are essential to our responsibility and could materially limit our**

**business practices.**" (Emphasis in original). Under that risk factor, the registration statement

discusses the $42.5 million settlement of the ERISA class action, but notes that the settlement

did not buy Medco peace because even if the proposed settlement is approved, some class

members may opt out of the class and institute or continue to prosecute separate actions against

Medco which could result in the award of material damages against Medco. The registration

statement specifically cautions (page 24) that "the outcome of each of these lawsuits is uncertain,

and an adverse determination in any one of them could significantly negatively affect our ability

to obtain rebates that are essential to our profitability and could materially limit our business

practices." Medco has agreed to indemnify Merck for substantially all monetary liabilities

relating to these lawsuits.

40.     The second risk factor in the registration statement (page 24) states that

Medco is "**subject to government investigations challenging our business under federal and**

**state civil fraud, anti-kickback and other laws, and are a defendant in two qui tam actions**

**in which the federal government has intervened, any of which could limit our business**

**practices and harm our profitability.**" (Emphasis in original). The Qui Tam Actions are

discussed in that risk factor with an acknowledgment that certain of the underlying wrongful

conduct identified in the Qui Tam Actions has been under investigation since 1998. The

registration statement notes (page 25) that:

> Sanctions for violating these laws may include criminal and civil
> sanctions, substantial monetary fines and exclusion from

13

participation in federal health care programs. To date, these laws have not been applied to prohibit the types of business arrangements we have with pharmaceutical manufacturers, health plan sponsors or retail pharmacies. However, courts and enforcement authorities that administer the anti-kickback laws have historically interpreted these laws broadly.

\*       \*       \*

The outcome of proceedings, requests for information or other actions pursuant to the investigation or other similar actions is uncertain, and an adverse outcome or result in any of these proceedings could have a material adverse effect on our business practices, financial condition or profitability.

41.     The third risk factor also relates to pending litigation, and states that

**"Pending litigation relating to our financial relationship with pharmaceutical manufacturers could significantly limit our ability to obtain discounts and rebates that are essential to our profitability**." (Emphasis in original). This risk factor relates to existing antitrust claims that appear to have been specifically excluded from the release contained in the proposed settlement of the ERISA class action. According to the registration statement Merck has agreed to indemnify Medco for substantially all monetary liabilities relating to those lawsuits.

42.     The fourth risk factor in the registration statement (page 26), states: **"We are defendants in pending actions relating to our revenue recognition practices for retail co-payments**." (Emphasis in original). This factor relates to the class action securities litigation arising out of the revenue restatement alleged above. With respect to those consolidated actions, the registration statement notes: "Although Merck has agreed to indemnify us for a significant portion of any damages or settlement payments in connection with this litigation, we could be liable for a material amount of any damages or settlement payment."

14

## COUNT I

### (Unjust Enrichment)

43.     Plaintiffs reallege and incorporate by reference each and every allegation set forth above.

44.     This Claim is brought derivatively by plaintiffs on behalf of the Company and Medco against the Executive Defendants.

45.     Merck and Medco have sustained damages as a result of defendants' conduct because Merck overcompensated certain of its senior executives based on falsely reported revenue figures, the correct reporting of which was the responsibility of the Executive Defendants.

46.     The bonus compensation and award of stock options to senior Merck executives including, without limitation, defendant Gilmartin, were based in part on reported revenues, according to the Company's March 21, 2002 Proxy Statement ("Compensation of Directors;" "Compensation and Benefits Committee Report on Executive Compensation -- Bonus Awards, Stock Options"). Effective March 1, 2001, defendant Gilmartin's base salary was increased from $1,300,008 to $1,400,004. For the year 2001, his bonus award was $1,500,000. The bonus award was based on, inter alia, Merck's "sales growth." Furthermore, on March 2, 2001, Gilmartin was granted a stock option to purchase 500,000 shares of Merck common stock. (Proxy Statement, "Compensation of the Chief Executive Officer"). Because revenues were overstated, Gilmartin and the other Executive Defendants were overcompensated based upon a mistake of fact.

47.     The excess bonus payments and awards of stock options set forth above, based on the Company's overstated revenues, constitute unjust enrichment to the Executive

15

Defendants because they were not entitled to the pecuniary and financial benefits conferred upon them thereby. Moreover, the Executive Defendants improperly and unjustly benefited and continue to benefit, to the Company's detriment, from their receipt of such excess bonus payments and awards.

48.     Such unjust enrichment occurred at the Company's cost and expense, which is the rightful owner of the excess amount of bonus payments and awards of stock options. The Company has therefore been injured thereby to the amount and to the extent that the Executive Defendants benefited from the unjust enrichment they received as described above. Plaintiffs, as stockholders and derivative representatives of the Company, seek damages and other relief for the Company in the amount of the unjust enrichment by which the Executive Defendants improperly benefited.

## COUNT II

### (Breach of Fiduciary Duty)

49.     Plaintiffs reallege and incorporate by reference each and every allegation set forth above.

50.     This Claim is brought derivatively by plaintiffs on behalf of the Company against the Executive Defendants, the Director Defendants, and the Audit Committee Defendants. These defendants are fiduciaries of the Company and of all of its public stockholders, and owe to them the duty to conduct the business of the Company loyally, faithfully, carefully, diligently, and prudently. These claims are asserted based upon the Individual Defendants' acts in violation of applicable state law and common law, which acts constitute gross and reckless breaches of fiduciary duties.

51.     The Executive Defendants, in their roles as executives of the Company, participated in the acts of mismanagement alleged herein, or acted in reckless disregard of the facts known to them, by failing to exercise due care to prevent the inclusion of co-payments as revenue, which acts of mismanagement now expose the Company to substantial risk and financial injury. The Audit Committee Defendants acted in reckless disregard of facts known to them or reasonably available to them given their special role as guardians of the integrity of the Company's reported financial results. Even the most basic good faith inquiry by defendants, the Company's senior executives, and the members of the Audit Committee of the Company's board of directors, who are named as defendants herein, would have uncovered this error of including co-payments in the reporting of the Company's revenue. The failure to cause the Company properly to record its revenue (more accurately, the lack thereof) from co-payments was the result of nothing less than gross negligence, if not severe recklessness, on the part of the

17

Executive Defendants and the Audit Committee Defendants. Moreover, the Director Defendants became aware, through their consideration of plaintiffs' September 17, 2002 letter (Exhibit A) and otherwise, of the facts alleged herein, but did nothing to correct them, and thereby breached their duty of care, loyalty, accountability, and disclosure to the stockholders of the Company by failing to act as an ordinarily prudent person would have acted in a like position.

52.    The Executive Defendants and Director Defendants have been responsible for the gross mismanagement of the Company. These defendants abdicated their corporate responsibilities by mismanaging the Company in at least the following ways:

(a)    They caused the Company to purchase its own securities in the public markets at artificially inflated prices;

(b)    They subjected the Company to adverse publicity, thereby impairing its good will and relationships with the Company's customers, lenders, and investors by, among other things, causing the Company to be named as a defendant in a consolidated securities fraud case pending in this District;

(c)    They caused the Company to pay excessive bonuses based upon misreported and overstated revenues; and

(d)    Their actions led to the decrease in the price of the IPO, and its subsequent delay, and then cancellation, along with the delay in the note offering.

53.    As a result of these defendants' wrongful conduct and actions, including the failure to maintain a system of internal controls adequate to ensure the Company's compliance with the federal securities laws, the Company has suffered considerable damage to, and drastic diminution in, the value of its assets.

54.    The Director Defendants and the Executive Defendants, singly and in

concert, engaged in the aforesaid conduct in grossly negligent and/or reckless disregard of their fiduciary duties to the Company.

55. By reason of the foregoing, the Director Defendants and the Executive Defendants have breached their fiduciary obligations to the Company and its stockholders.

56. The Company and its stockholders have been injured by reason of these defendants' grossly negligent breach and/or reckless disregard of their fiduciary duties to the Company. The Individual Defendants engaged in the aforesaid conduct without exercising the reasonable and ordinary care which they as directors and senior executives owed to the Company, and have thereby wrongfully breached and/or aided and abetted breaches of fiduciary duties to the Company. Plaintiffs, as stockholders and derivative representatives of the Company, seek damages and other relief for the Company as hereinafter set forth.

# COUNT III

## (Against Arthur Andersen for Professional Negligence)

57. Plaintiffs reallege and incorporate by reference each and every allegation contained above.

58. This Claim for Relief is brought by plaintiff derivatively on behalf of Merck and Medco against Arthur Andersen for professional negligence.

59. At all times relevant hereto, Arthur Andersen, as Merck's and Medco's auditor, owed to Merck and Medco the duties of due care and professional competence.

60. Arthur Andersen breached its duties of due care and professional competence by, among other things, failing to render services in accordance with GAAS, and preparing and/or approving financial statements that were not prepared in accordance with GAAP.

61. As a direct and proximate result of Arthur Andersen's professional negligence, Medco and Merck have suffered damages, including but not limited to damages associated with Merck and Medco's restatement of historical financial results, the loss of credibility in the market, the cancellation of the IPO and related notes offering, and the costs which Merck and Medco are incurring and will continue to incur in connection with the defense and potential settlement of the consolidated securities fraud class action currently pending in this District.

## COUNT IV

### (Against The Director Defendants and The Executive Defendants for Contribution And Indemnification)

62.     Plaintiffs reallege and incorporate by reference each and every allegation contained above.

63.     This Claim is brought derivatively by plaintiffs on behalf of Merck and Medco against the Executive Defendants and Director Defendants for contribution and indemnification.

64.     Merck and Medco are alleged to be liable to plaintiffs and the putative class in the consolidated securities fraud actions for misleading the public about the Company's operations and results. In the event the Company and Medco are found liable to those persons for violating the federal securities laws, the Company's and Medco's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of the Director Defendants and the Executive Defendants as alleged herein, and the Company and Medco will be entitled to receive contribution from the Individual Defendants in connection with the consolidated securities fraud action against the Company and Medco currently pending in this District. In the event the Company and Medco are found liable to those persons for violating principles of state and/or common law, the Company's and Medco's liability will result in whole or in part from the intentional, knowing, reckless, or grossly negligent acts or omissions of the Individual Defendants as alleged herein, and the Company and Medco will be entitled to receive contribution or indemnification from these defendants to the extent such claims are or will be brought against the Company.

## DERIVATIVE ALLEGATIONS

65.     Plaintiffs bring this action derivatively in the right of and for the benefit of the Company, and double derivatively in the right of and for the benefit of Medco, to redress injuries suffered and to be suffered by Merck and Medco as a direct result of defendants' wrongdoings.

66.     Plaintiffs will adequately and fairly represent the interests of Merck and Medco in enforcing and prosecuting their rights.

67.     This action is brought to remedy violations of applicable law.

68.     This action is not a collusive one to confer jurisdiction on this Court.

## Demand Was Made and Refused With Respect to Certain Claims

69.     On September 17, 2002, plaintiffs made a demand on the Board of Merck to institute this action, through a detailed four-page letter from their counsel that specifically set forth the allegations concerning the overstatement of Medco's revenues and the consequent damages to Merck from that conduct (and which are the subject of Counts I and II of this Complaint). A copy of plaintiffs' September 17, 2002 letter is attached hereto as Exhibit A.

70.     Following a subsequent inquiry from counsel for the Board, plaintiffs on November 4, 2002 sent another letter further describing the underlying claims. A copy of that letter is attached hereto as Exhibit B.

71.     The Board formally refused such demand by letter dated December 20, 2002, a copy of which is attached hereto as Exhibit C. Plaintiff's counsel then wrote a letter asking for the basis for the Board's refusal, a copy of which letter is attached hereto as Exhibit D. On January 14, 2003, counsel for the Board responded by letter (a copy of which is attached hereto as Exhibit E) and declined to provide a basis for refusing the proceed with the lawsuit

22

unless plaintiffs instituted an action in court.

## Demand Was Futile and Therefore Was Not Made on
## Merck's Board of Directors With Respect to Other Claims

72.     With respect to the claims asserted arising out of the liability which Merck

and Medco will likely incur from the prosecution of the Qui Tam Actions, demand on the Merck

board of directors is futile for the following reasons:

(A)     A majority of Merck's Board either profited from or is exposed to

liability arising from the wrongful conduct alleged in this action with respect to the misstatement

of Medco's revenues because, as alleged above, the Audit Committee Defendants were charged

with the responsibility for overseeing Merck's accounting, financial reporting process, internal

controls and audits. As alleged above, the Director Defendants had the legal responsibility for

overseeing the affairs of the Company, and thus had an obligation to keep themselves informed

about the Company's business and strategies. In addition, with respect to the claims which have

been asserted against defendant Arthur Andersen, the Audit Committee Defendants and

Executive Defendants are potentially defendants in any cross-claim which Arthur Andersen may

seek to assert. As a result, those members of Merck's Board will not cause Merck to sue Arthur

Andersen because if such a suit is commenced, it is likely that Arthur Andersen will cross-claim

against them;

(B)     A majority of Merck's directors participated in, acquiesced in,

and/or approved the acts or omissions or recklessly disregarded the wrongs alleged herein; did so

in affirmative violation of their duties to the Company; and have permitted the wrongs alleged to

occur and/or have remained inactive although they had knowledge or notice of those wrongs.

Thus, the Company's Board could not exercise independent objective judgment in deciding

whether to bring or vigorously prosecute this action. The members of the Company's Board continually had ready access to, or received, internal memoranda and documents, which information should have caused them to realize that revenues at Medco were inflated artificially and that many of the Company's and Medco's business practices were under intense review by government authorities, a process which could result in payment of hundreds of millions of dollars in penalties. Yet the Director Defendants failed to act to correct any of these wrongful practices and continued to allow corporate decisions to be made including, without limitation, those related to executive compensation;

(C)     The Director Defendants and the Audit Committee Defendants cannot defend their actions by any alleged "independent" business judgment because each of them acted in bad faith, grossly and recklessly abused their discretion, acted in breach of their fiduciary duties to the Company and its stockholders, and failed to act and abdicated their functions and duties as directors; and

(D)     The Director Defendants and the Audit Committee Defendants have a variety of overlapping business and personal relationships with other directors which impede their ability to act in a disinterested fashion with respect to any potential litigation which could be brought for the benefit of Merck, including the following:

1.     William B. Harrison, Jr.   In addition to his service on the Audit Committee and the Board of Directors, Harrison is the Chairman and Chief Executive Officer of Chase, which provides financial advisory, commercial and investment banking services to Merck. Chase's services to Merck include, without limitation, its services as one of the proposed lead underwriters for the now cancelled Medco IPO, and its services as one of the proposed lead underwriters with respect to a proposed $500 million debt offering of Medco.

24

2. **Lawrence Bossidy.** Mr. Bossidy is a member of the board of directors of Chase with respect to which defendant Harrison is Chairman and Chief Executive Officer. In addition, Mr. Bossidy serves on The Business Council and The Business Roundtable together with defendant Gilmartin.

3. **Johnetta B. Cole.** Ms. Cole is the President of Bennet College, which either has received, or seeks to receive, substantial corporate contributions from Merck. Evidence of her close relationship with defendant Gilmartin is her presentation to defendant Gilmartin of the Patterson Award at the 1996 United Negro College Fund dinner in 1996.

4. **William N. Kelly.** Mr. Kelly, together with Ms. Cole, serves as a Trustee of Emory University. Mr. Kelly is also, together with Messrs. Shenk and Thier, a Fellow of the American Academy of Arts and Sciences and a Member of the Institute of Medicine of the National Academy of Sciences. In addition, Mr. Kelley is a Professor of Medicine at the University of Pennsylvania School of Medicine, an institution which either has received, or seeks to receive, substantial corporate contributions from Merck.

## Demand Was Futile and Therefore Was Not Made on Medco's Board of Directors With Respect to Other Claims

73. With respect to the claims asserted on behalf of Medco, demand is futile and was not made because Medco's board of directors currently consists of four members, three of which - Messrs. Clark, Frazier and Lewent -- are named as defendants in this action, and all of whom were senior executives of both Medco and Merck at the time of the wrongdoings alleged herein.

**WHEREFORE**, plaintiffs demand judgment as follows:

A.    Declaring the Individual Defendants have breached and participated in the breach of their fiduciary duties to Merck and Medco;

B.    Against the Individual Defendants and in favor of Merck and Medco for the amount of damages sustained by Merck and Medco or which will be sustained as a result of the breaches of fiduciary duties alleged herein;

C.    Ordering any and all appropriate equitable and/or injunctive relief against the Individual Defendants to the extent that Merck and Medco are unable to obtain from such defendants an adequate remedy at law;

D.    Directing, in the event that Merck and Medco are found liable to the plaintiffs and the putative class they seek to represent in the securities fraud actions pending in this District or otherwise, that Merck and Medco are entitled to contribution and/or indemnification from the Individual Defendants;

E.    Awarding Merck and Medco compensatory damages, including prejudgment and post-judgment interest;

F.    Awarding plaintiffs in this action their reasonable attorney's fees, expert's fees, and other reasonable costs and expenses; and

G.    Granting such other and further relief as this Court may deem just and

proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated: August 5, 2003

**STERNS & WEINROTH**

By: _____
    Joel H. Sterns (JS-4022)
    Jason S. Feinstein (JF-8008)
    50 West State Street, Suite 1400
    P.O. Box 1298
    Trenton, N.J. 08807
    Telephone: (609) 392-2100

**ABRAHAM & ASSOCIATES**
Jeffrey S. Abraham (JA-2946)
Samuel R. Simon (SS-8761)
One Penn Plaza, Suite 1910
New York, N.Y. 10119
Telephone: (212) 714-2444

**Attorneys for Plaintiffs**

## VERIFICATION

I, Ellen Fagin, plaintiff herein, hereby verify pursuant to that I have read the attached Verified Amended Shareholders' Derivative Complaint and Jury Trial Demand, and state under penalty of perjury that it is true and correct to the best of my knowledge, information and belief.

Executed on July 30, 2003.

Ellen Fagin

Exhibit A

EXHIBIT A

LAW OFFICES

# ABRAHAM & ASSOCIATES

ONE PENN PLAZA

SUITE 1910

NEW YORK, N.Y. 10119

TEL: (212) 714-2444

FAX: (212) 279-3655

September 17, 2002

**By Federal Express**

Board of Directors
Merck & Co., Inc.
One Merck Drive
P.O. Box 100
Whitehouse Station, N.J.   08889-0100

To the Board of Directors of Merck & Co., Inc.:

This firm represents Ellen Fagin and Judith Fagin, individuals who are, and at the times relevant to the issues addressed in this letter were, shareholders of Merck & Co., Inc. ("Merck" or the "Company"). This letter is intended to demand that you take appropriate legal action against: (i) Raymond V. Gilmartin, the Chairman, President, and Chief Executive Officer of the Company; (ii) Edward M. Scolnick, Executive Vice President, Science and Technology, and President, Merck Research Laboratories; (iii) the following individuals who were members of the Company's Audit Committee: William B. Harrison, Jr., Heidi G. Miller, Thomas E. Shenk and Samuel O. Thier; and (iv) any other individuals responsible for causing the substantial damage to Merck (collectively referred to herein as the "Proposed Individual Defendants" or the "Individuals.")

As you know, Merck is subject to regulatory oversight by the Securities and Exchange Commission (the "SEC"), among others, and must comply with appropriate standards when reporting its financial information. During June, 2002, it was revealed that the SEC has expressed concerns about Merck's revenue recognition policies. Specifically, on or about June 21, 2002, it was reported that Merck may have overstated revenues by billions of dollars from its subsidiary Merck-Medco Managed Care, L.L.C. ("Medco") by including customer co-payments for prescription drugs in its revenues. Such co-payments were paid by the customer directly to the pharmacy when the medicine was purchased for their portion of the cost of the prescription under an insurance plan. No amount of those co-payments were provided to either Merck or Medco. Neither Merck nor Medco bills for those co-payments, gets billed for them, or otherwise comes into contact with any of the money from co-payments. At the time, it was reported that Merck's revenues for 2001 may have been overstated by as much as $4.6 billion. On July 7,

2002, the Company admitted that $14.05 billion in co-payments to pharmacies were counted as revenue by Medco from January 1, 1999 to March 30, 2002. Such amount represents approximately 10.5 percent of the Company's total sales during that time period.

The Company was damaged by, among other things, the fact that the more than $14 billion in sales that Merck booked, but did not receive, were used by the Company to determine executive bonuses. Specifically, according to the Proxy Statement filed with the SEC by Merck, dated March 21, 2002, those bonuses were determined, in part, by comparing the Company's growth in sales and earnings per share to that of certain other leading healthcare companies.

Earlier this year, prior to the disclosures about Merck's including co-payments as revenue, the Company's board and its Audit Committee decided to no longer engage Arthur Andersen LLP ("Andersen") as the Company's public accountants. Andersen has since been convicted of obstruction of justice for shredding documents related to its audit of Enron Corp.

Also earlier in the year, during January, 2002, Merck announced plans to establish Medco as a separate, publicly-traded company, and planned an initial public offering of a portion of Medco (the "IPO") by mid-2002, with a full separation of Medco completed within about 12 months of the IPO. On or about June 13, 2002, Merck announced that it would offer up to 46,700,000 shares of common stock in the IPO, which were to be priced at between $22 and $24 per share. Shortly after Merck's disclosure of the amount of co-payments it included as revenue, however, Merck twice delayed the IPO, then announced on July 9, 2002 that it withdrew its IPO, in part, reportedly, because of questions about Medco's accounting methods. It was reported that buyers could not be found for the Medco shares at an offering price of $18 per share, which already was a sharp decrease from the initial plan of pricing the offering at $22 to $24 per share. It was estimated that the proposed IPO would raise less than $841 million at the lowered price or approximately $280 million less than initially planned; a 25% decrease in the funds that were to be raised. The Medco IPO was subsequently cancelled by Merck. Moreover, the postponement of the Medco offering also delayed a planned concomitant bond offering, which was to provide Merck with approximately $1 billion.

Reactions to Merck's recognition of co-payments as revenue and its withdrawal of the IPO were swift and negative. On July 8, 2002, a senior pharmaceutical analyst at Columbia Management Group was reported as stating that Merck wanted to go ahead with the IPO and that it would "be a black eye for them and their bankers if the don't . . . ." After the disclosure of the $14.05 billion in revenue that it booked but did not receive, Patricia Hughes, a professor of accounting at the Anderson School of Management at the University of California, Los Angeles, was quoted by <u>Bloomberg News</u> on July 8, 2002 as stating: "Merck never receives the cash at all. It seems definitely wrong that they're showing it as revenue. Many investors look at revenues, so that's certainly misleading." Martin Bukoll, an analyst at Northern Trust was quoted as stating: the issues surrounding Medco had "tarnished the silver that is Merck . . . ."

As a result of the Company's disclosures about including these co-payments as revenue,

Merck's stock price plummeted. The decline in its stock price has resulted in the Company being exposed to several class action lawsuits alleging violations of the federal securities laws by the Company. These actions are pending in the United States District Court for the District of New Jersey and generally allege that the defendants named therein overstated Merck's revenues and that the Company's falsely inflated reported revenues violated generally accepted accounting principles. The actions claim that Merck's policies are contrary to the revenue recognition practices of two of its biggest competitors. The federal securities actions will likely result in the Company incurring substantial additional costs both in defense of the actions and in paying either substantial amounts in damages as a result of an adverse verdict, or a settlement.

It is the responsibility of individuals such as Messers, Gilmartin and Scolnick, in their capacities as the most senior executives of the Company to prevent such purportedly unlawful activities from taking place. As such, they are responsible for the damages which those activities have caused, and will cause, the Company.

In addition, the members of the Audit Committee were specifically charged with the responsibility of "oversee[ing] the Company's financial reporting process and internal controls." The Company states that: "As part of its duties, the [Audit] Committee consults with management, internal auditors and the Company's independent public accountants during the year on matters related to the annual audit, internal controls, the published financial statements and the accounting principles and auditing procedures being applied." Given that Merck has been including co-payments as revenue for years, when combined with the alleged violations of the securities laws, the members of the Audit Committee must take responsibility for their actions (or inactions) and indemnify the Company for any damages it has suffered and will suffer arising out of those actions (or inactions).

Since the time these alleged wrongdoings were first exposed, the Company does not appear to have taken any legal action against the Individuals for the damage caused to the Company. This letter is a demand letter, the intention of which is to give the Board of Directors the first opportunity at instituting claims on behalf of the Company against the Proposed Individual Defendants. If you fail to respond or contact me within one month of the receipt of this letter (i.e., by the end of October, 2002), we will be forced to assume that you have decided not to pursue these claims and then we will feel free to institute an action in State or Federal court to obtain the remedies we are asking you to obtain from the Proposed Individual Defendants.

LAW OFFICES
**ABRAHAM & ASSOCIATES**

Page 4 of 4

If you have any questions or wish to discuss any of the matters referred to above, please do not hesitate to contact me.

Very truly yours,

Jeffrey S. Abraham

cc: Ms. Ellen Fagin
    Ms. Judith Fagin

EXHIBIT B

LAW OFFICES

# ABRAHAM & ASSOCIATES

ONE PENN PLAZA

SUITE 1910

NEW YORK, N.Y. 10119

TEL: (212) 714-2444

FAX: (212) 279-3655

November 4, 2002

**By Fax**

Alan R. Glickman, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, N.Y. 10022

Re: *Merck & Co. Derivative Demand Letter*

Dear Mr. Glickman:

I write with respect to your letters of October 17 and October 21, 2002, concerning the above-referenced matter.

On the issue of my clients' standing to make the demand and to institute a shareholder's derivative lawsuit in the event demand is refused, I enclose documents evidencing their continuous ownership of Merck & Co., Inc. ("Merck" or the "Company") common stock since April 1994. In addition, with respect to Ellen Fagin, I enclose a Direct Registration Statement from Merck with respect to an additional 100 shares of Merck common stock that she received in a two-for-one stock split in February 1999. Similarly, Judith Fagin received an additional 200 shares in the same stock split, which is reflected in her stock certificate dated March 1, 1999. Judith Fagin's shares of Merck are held in joint tenancy with Philip Fagin, her husband.

With respect to the issues raised by the underlying demand made on Merck's board of directors, I am perplexed by your letter because the facts and information which support my clients' demand are set forth in my letter of September 17, 2002. I will attempt in this letter to put those facts into a more easily understood format.

1. Medco Health Solutions, Inc. ("Medco") is a wholly-owned subsidiary of Merck.

2. Medco is a pharmacy benefit manager which, according to a Form S-1 registration statement filed with the Securities and Exchange Commission ("SEC"), provides sophisticated programs and services for clients and the

LAW OFFICES

## ABRAHAM & ASSOCIATES

Alan R. Glickman, Esq.
November 4, 2002
Page 2

members of their pharmacy benefit plans, as well as for the physicians and pharmacies the members use. This is primarily accomplished by negotiating competitive rebates and discounts from pharmaceutical manufacturers, obtaining competitive discounts from retail pharmacies, and administering prescriptions filled through Medco's national networks of retail pharmacies or its own home delivery pharmacies.

3.  As part of the process, consumers generally make co-payments to their pharmacies to cover their portion of the cost of the prescriptions under an insurance plan. Typically, the pharmacy keeps the entire amount of the co-payment, and no amount is provided to Medco.

4.  On July 7, 2002, the Company admitted that from January 1, 1999 to March 30, 2002 these co-payments amounted to $14.05 billion, which was counted as revenue by Merck. This admission was apparently made in response to concerns expressed by the SEC while reviewing Medco's financial information in connection with its proposed public offering.

5.  The Company has asserted that the overstatement of revenues had no impact on Merck's reported earnings. However, even assuming the truth of that assertion for purposes of this letter, the Company has nonetheless sustained damages from the overstatement, including the following:

First. The bonus compensation and award of stock options to senior Merck executives including, without limitation, Raymond Gilmartin, were based in part on reported revenues, according to the Company's most recent proxy statement. Because revenues were overstated, those executives were over-compensated based on a mistake of fact.

Second. The market price of Merck's common stock was artificially inflated, as evidenced by the drop in the price of the stock following the revelations of revenue overstatement. To the extent the Company repurchased is own common stock during the relevant period of time, either in open-market or private transactions, it overpaid and was damaged by the amount of the overpayments. In this regard, I note that a July 23, 2002, press release by the Company stated that since February 2000, Merck had spent $7.7 *billion* to buyback 115.3 million of its own shares.

Third. Merck has been sued in the United States District Court for the

LAW OFFICES
ABRAHAM & ASSOCIATES

Alan R. Glickman, Esq.
November 4, 2002
Page 3

District of New Jersey in several now-consolidated securities fraud class actions seeking damages for investors who claim to have overpaid for Merck stock due to the revenue overstatement.

6.    To the extent the revenue overstatement resulted in excess compensation or overpayment for stock sold to the Company by Mr. Gilmartin or any other Merck senior executives or directors, the conduct involves a breach of the fiduciary duty of loyalty. Those persons would need to demonstrate the entire fairness of the transactions in question to avoid liability - - something which they could not possibly do. Moreover, any effort to indemnify Mr. Gilmartin for such liability would be beyond the bounds of N.J.S.A. 14A:2-7(3) because indemnification cannot be made in cases involving a breach of a duty of loyalty or in cases in which the individual in question (*i.e.*, Mr. Gilmartin) received an improper personal benefit.

7.    The excess bonus payments and awards of stock options based on the overstated revenues are based on mistakes of fact and are therefore voidable as a matter of contract law. Once again, indemnification is unavailable because of the improper personal benefit that the affected Merck executives received.

8.    The conduct of Mr. Gilmartin and the Audit Committee in exposing the Company to liability from the pending consolidated securities fraud class action constitutes a breach of the duty of care. Although the Company may have a provision in its certificate of incorporation exempting senior executives and directors for negligent breaches of that duty, the conduct here goes far beyond mere negligence. The overstatement of revenues involved a violations of Generally Accepted Accounting Principles ("GAAP"). Even the most basic good faith inquiry by the Company's senior executives and the members of the Audit Committee of the Company's board of directors - - William B. Harrison, Jr., Heidi G. Miller, Thomas E. Shenk, and Samuel O. Thier — would have uncovered this error in the reporting of the Company's revenue. The failure to cause the Company properly to report its revenue (or lack thereof) from co-payments could be the result of nothing less than gross negligence, if not severe recklessness, on the part of Mr. Gilmartin and the members of the Audit Committee. Therefore, this category of damages is also outside the bounds of the protection of N.J.S.A. 14A:2-7(3), which limits indemnification to acts taken in good faith.

LAW OFFICES

## ABRAHAM & ASSOCIATES

Alan R. Glickman, Esq.
November 4, 2002
Page 4

If you have any questions or wish to discuss any of the matters discussed in this letter, please do not hesitate to contact me.

Very truly yours,

Jeffrey S. Abraham

JSA:ss
Enclosures
cc: Ms. Ellen Fagin
 Ms. Judith Fagin

Case 3:03-cv-02659-DRD-JKG Document 5-2 Filed 06/19/07 Page 40 of 50 PageID: 594



**MERCK**

Merck & Co., Inc.

A NEW JERSEY CORPORATION

THIS CERTIFICATE IS TRANSFERABLE IN
NEW YORK, N.Y. OR IN MINNEAPOLIS, MN.

COMMON STOCK

TRAB005619

4050232119

0020

NUMBER

ZQ W  335963

CUSIP 589331 10 7

SEE REVERSE FOR CERTAIN DEFINITIONS



FULLY PAID AND NON-ASSESSABLE SHARES OF THE COMMON STOCK

of Merck & Co., Inc. transferable on the books of the Corporation by the holder hereof in person or by duly authorized
attorney upon surrender of this certificate properly endorsed. This certificate and the shares represented hereby are issued and
shall be held subject to all the provisions of the Certificate of Incorporation and all amendments thereto of Merck & Co., Inc.
and to any existing agreement between the Corporation and the holder hereof. This certificate is not valid
until countersigned and registered by the Registrar.

Witness the facsimile seal of the Corporation and the facsimile signatures of its proper officers.

Dated: APRIL 20, 1994

COUNTERSIGNED AND REGISTERED:
NORWEST BANK MINNESOTA, N.A.
TRANSFER AGENT
AND REGISTRAR

BY

AUTHORIZED SIGNATURE



MERCK & CO., INC.
NEW JERSEY

CHAIRMAN OF THE BOARD

SECRETARY


# MERCK

## DIRECT REGISTRATION STATEMENT

ELLEN FAGIN
210 W 70TH ST
NEW YORK NY 10023-4304

Norwest Shareowner Services℠
PO Box 64874
St Paul MN 55164-0874

4000232119

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Please use the reverse side of this form ONLY if you choose to initiate one of the following transactions:

1. Deposit certificates to your account
2. Transfer ownership of your book-entry shares
3. Withdraw book-entry shares from your account
4. Establish a PIN number to facilitate future book-entry sale transactions

5. Sell book-entry shares
6. Record Broker/Dealer Information to your account
7. Deliver book-entry shares to your Broker/Dealer

| Transaction or Settlement Date | Transaction Type | * Gross Amount | * Service Charge | *Brokerage Commission | * Net Amount | * Price Per Share | Share Amount |
|---|---|---|---|---|---|---|---|
| 02/16/99 | STS | | | | | | 100.000 |

*THESE CATEGORIES APPLY ONLY TO SALE TRANSACTIONS (NET AMOUNT MAY ALSO INCLUDE ANY TAXES WITHHELD)

| BOOK-ENTRY SHARES | STOCK INVESTMENT PLAN SHARES | CERTIFICATE SHARES |
|---|---|---|
| 100.000 | 0.000 | 100.000 |

DTD – Deposit to Stock Investment Plan
IFD – Issue from Stock Investment Plan
SOP – Stock Option
DBE – Deposit Certificates into Book-entry

WBE– Withdraw Book-entry Shares
TRA – Transfer Book-entry Shares
STD – Stock Dividend Shares
STS – Stock Split Shares

CBK – Receive Book-entry Shares From Broker
DBK – Deliver Book-entry Shares to Broker
SLE – Sell Book-entry Shares

| | | | |
|---|---|---|---|
| Account Name FAGIN,ELLEN | | Statement Date 02/02/99 | |
| Account No. 4000232119 | | Broker/Dealer Firm Name | |
| Cusip 589331107 | | Broker/Dealer Participant No. | |
| Issue Name MERCK & CO INC | | Broker/Dealer Account No. | |

This statement is a record of rights of the addressee at the time of its issuance. Delivery of this statement of itself conveys no rights to the recipient. This statement is neither a negotiable instrument nor a security.

PLEASE RETAIN THIS STATEMENT FOR YOUR RECORDS



# MERCK

## Merck & Co., Inc.

A NEW JERSEY CORPORATION

THIS CERTIFICATE IS TRANSFERABLE IN
NEW YORK, N.Y./OR IN MINNEAPOLIS, MN.

CUSIP 589331 10 7
SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES THAT

PHILIP FAYIN &
JUDITH FAYIN JT TEN
132 E 35TH ST
BROOKLYN NY 11226-5014

**CERTIFICATE OF STOCK**

is the owner of

FULLY PAID AND NON-ASSESSABLE SHARES OF THE COMMON STOCK

of Merck & Co., Inc. transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of this certificate properly endorsed. This certificate is not valid until countersigned and registered by the Transfer Agent and Registrar.

Witness the facsimile seal of the Corporation and the facsimile signatures of its proper officers.

Dated:

**MARCH 1, 1999**





BY

AUTHORIZED SIGNATURE

COUNTERSIGNED AND REGISTERED:
NORWEST BANK MINNESOTA, N.A.
TRANSFER AGENT
AND REGISTRAR



CHAIRMAN OF THE BOARD

SECRETARY





4,572







EXHiBiT C

Exhibit C

# SCHULTE ROTH & ZABEL LLP

919 Third Avenue
New York, NY 10022
(212) 756-2000
fax (212) 593-5955

*www.srz.com*

Alan R. Glickman
(212) 756-2210

E-mail
alan.glickman@srz.com

December 20, 2002

VIA FACSIMILE
& BY HAND

Jeffrey S. Abraham, Esq.
Abraham & Associates
One Penn Plaza
Suite 1910
New York, NY  10119

Re:   Demand Letter to Merck & Co., Inc.

Dear Mr. Abraham:

I have been asked to inform you that the Board of Directors of Merck & Co., Inc., has considered the shareholder demand sent by you on September 17, 2002, and has concluded that commencement of the legal action sought by the demand would not be in the best interests of the company because the litigation would not be meritorious, would constitute a waste of company assets and diversion of management resources, and would result in a loss of employee morale and negative publicity.  Accordingly, the Board has declined to pursue such litigation and has rejected the demand.

Sincerely,

Alan R. Glickman

9352587.1

EXHIBIT D

Exhibit D

LAW OFFICES

# ABRAHAM & ASSOCIATES

ONE PENN PLAZA

SUITE 1910

NEW YORK, N.Y. 10119

TEL: (212) 714-2444

FAX: (212) 279-3655

December 23, 2002

*By Fax*
Alan R. Gluckman, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, N.Y. 10022

Re: *Merck & Co. Derivative Demand Letter*

Dear Mr. Gluckman:

I write with respect to your letter of December 20, 2002.

I understand from your letter that a decision has been made by Merck's board of directors to reject the demand to institute ligation made by my firm on behalf of Merck's shareholders. New Jersey law specifically requires that for a decision of the board of directors to be binding defendants have the "burden of demonstrating that the Board's decision to terminate the litigation was reasonable." In Re: PSE&G Shareholder Litigation, 173 N.J. 258, 295 (N.J. 2002).

There is nothing in your letter which, in my opinion, demonstrates the reasonableness of the decision taken by the board of directors. Instead, you have proffered a series of boilerplate responses lacking any factual or analytical support. Therefore, please provide me with a copy of any report or analysis upon which the board of directors' decision is based, assuming such a report exists.

I look forward to hearing from you.

Very truly yours,

Jeffrey S. Abraham

# EX HiBiT E

Exhibit E

# SCHULTE ROTH & ZABEL LLP

919 Third Avenue
New York, NY 10022
(212) 756-2000
fax (212) 593-5955

*www.srz.com*

Alan R. Glickman
(212) 756-2210

E-mail
alan.glickman@srz.com

January 14, 2003

<u>VIA FACSIMILE & BY HAND</u>
Jeffrey S. Abraham, Esq.
Abraham & Associates
One Penn Plaza
Suite 1910
New York, NY 10119

Re:   Demand Letter to Merck & Co., Inc.

Dear Mr. Abraham:

I write in response to your letter of December 23, 2002, requesting any report or analysis upon which the Board of Directors of Merck & Co., Inc. ("Merck") based its decision to reject your clients' demand that Merck initiate litigation regarding the accounting for retail pharmacy copayments.

I informed you by letter of December 20, 2002, that the Board rejected the demand for a variety of reasons. This should not come as a surprise. The premise of your clients' claim is that Merck's copayment accounting violates Generally Accepted Accounting Principles, but, as is evident from the public record, two of the four major Pharmaceutical Benefit Managers (including Medco) utilize the same copayment accounting practice; two of the major accounting firms, Arthur Andersen and PricewaterhouseCoopers, approved of this practice; and the Securities and Exchange Commission had no objection to it after conducting a thorough review of the issue in connection with the Medco initial public offering.

In addition, as you no doubt are aware, the Editorial Board of the *Wall Street Journal* –which published an article regarding this subject on which you relied in your earlier correspondence—ultimately referred to the matter as a "completely spurious accounting scandal."

My firm did prepare a report for the Board. The decision that you cite in requesting the report, *In re PSE&G Litigation*, 173 N.J. 258 (N.J. 2002), arose where there had been a lawsuit filed, and particular claims and defenses were raised. Whatever requirement there

Jeffrey S. Abraham, Esq.
January 14, 2003
Page 2

may or may not be to provide an attorney's report in that context, this is not that context.  Your clients have filed no such lawsuit, and under the circumstances we are aware of no grounds for them to do so consistent with the requirement that they have a reasonable basis for their claims.

Sincerely,

Alan R. Glickman